ALBERT M. VAJDA, Plaintiff-Appellant, v. ARTHUR ANDERSEN AND COMPANY *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—92—1237

Opinion filed September 7, 1993.

346

Penny Nathan Kahan & Associates, Ltd., of Chicago (Penny Nathan Kahan and Lori D. Ecker, of counsel), for appellant.

Keck, Mahin & Cate, of Chicago (John A. McDonald, Donald J. McNeil, and Michael J. Mueller, of counsel), for appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff, Albert Vajda, a former manager of defendant, Arthur Andersen & Company (Andersen), sought damages both from Andersen for terminating his employment without just cause or first following the company's discipline policy, and from James A. Carty, an Andersen partner, for embarking on a course of conduct allegedly designed to have plaintiff wrongfully discharged. The circuit court granted defendants' joint motion for summary judgment on all four counts of plaintiff's fourth amended complaint.

Plaintiff appeals, seeking reversal and remandment for a jury trial, raising as issues whether (1) genuine issues of material fact with respect to employee termination procedures exist which preclude entry of summary judgment against him; (2) he possessed enforceable contractual rights against Andersen by virtue of written and oral promises made to him, as expressed in Andersen employee handbook documents and by Andersen supervisory staff, respectively; (3) the doctrine of promissory estoppel applies to these circumstances; (4) defendant Carty possessed a qualified privilege; and (5) Carty caused plaintiff's wrongful termination.

The facts essential to the disposition of this appeal were drawn from documentary evidence and deposition testimony submitted to the circuit court for consideration in the summary judgment proceedings.

Plaintiff was employed by Andersen for almost 21 years. He served as a manager in Andersen's "Information Systems Services Division" (ISS) during the last 12 years of his employment. During the course of plaintiff's employment with Andersen, the company issued a "Personal Reference Binder" (Manual) to each partner and employee of the company. The Manual set forth general employment policies and also stated:

"In issuing this binder, our prime purpose is to provide quick answers to your day-to-day questions on how the Firm operates and how you fit into the operation. On some matters it is the basic document that sets forth Firm policy; on other matters it summarizes Firm policy included in other publications, such as Office Management Bulletins, Firm Accounting Releases, *Ethical Standards* and *Highlights of Worldwide Code of Conduct* (Subject File AA2870, Items 1 and 60)."

In a section entitled "Personnel Policies" relating to employment and promotion, the Manual provided:

"The partners are committed to a policy and practice of deciding matters relating to employment, including compensation, advancement, transfer and promotion, on the basis of qualifications and merit alone."

The Manual also provided that "[f]ull-time regular employment is the usual arrangement in which a person is hired to work our normal business hours *** for a time period of indefinite duration."

There was evidence that in 1973, when plaintiff joined Andersen's "Information System Services Division" (ISS), he was told by the personnel office director that no employees would be dismissed without three warnings. In the late 1970s and early 1980s, plaintiff attended meetings where ISS personnel manager George Koch discussed the three-warning policy. He was instructed that there would be serious consequences if there was no just or good cause to terminate an employee, and then only after the three-warning policy was followed.

Plaintiff also received a copy of written three-warning procedures, contained in a document known as the "Supervisor's Seminar Personnel Policy Procedures" (Procedures), which remained unaltered between 1980 and 1987. The Procedures provide that the supervisor must give a verbal warning describing the poor performance or misconduct. After the verbal warning, the supervisor must document the warning discussion in a "greensheet" and submit it to the personnel office. The subject of the warning would be reviewed within two to three months. If there was no change in performance, a second warning would be given, again greensheet documented. Thereafter, if the conduct continued, the employee would receive a final warning, which must be documented in a greensheet as soon as possible. If the conduct continued, the instructions required the supervisor to call the appropriate superiors for approval to terminate. An employee would never be summarily fired.

The Procedures were distributed by Andersen at supervisors' seminars on a regular basis. In addition to being distributed to supervisory personnel in written form, the three-warning policy was made known verbally to all ISS employees through new employees' orientation, supervisors' seminars and at various meetings; it was common knowledge among them, as attested to by other ISS managers, Michael Kennedy and Robb Gay. The three-warning policy was also openly discussed by supervisors when they returned from their training seminars. Philip Keirn, an Andersen partner and head of ISS, spe-

cifically admitted that Andersen had a policy of requiring good cause for discharge.

The Manual, which provided that all employment decisions were to be based on merit and qualifications, as supplemented by written procedures therein described, together with the oral and written representations of a three-warning policy, were construed by plaintiff as having created a contract of employment, which provided that employees would not be discharged without just cause and without appropriate warnings.

ISS was assigned the task of developing or improving several of Andersen's data processing systems. Because ISS did not have sufficient staff or expertise to complete these projects by itself, Andersen assigned some of its "Management Information Consulting Division" (MICD) professionals to each of the projects.

Carty became the MICD partner assigned to certain ISS projects in 1982. He and ISS partner Keirn shared responsibility for some of these projects. Carty, however, was responsible for overall management of some projects, including general superintendence over ISS personnel and direct supervision over the MICD personnel. Carty evaluated plaintiff and participated with him in project steering committee and sponsor meetings. Plaintiff did not report to Carty, however, but to another Andersen employee, Mark Rosenthal, who reported to Keirn.

In the five-year period preceding plaintiff's termination, the annual written performance evaluations prepared by Andersen partners and plaintiff's superiors revealed strong, steady, and consistently above-average performance. Beginning in 1983, however, Carty considered some of plaintiff's behavior disruptive, because it interfered with Carty's authority over MICD staffing. At one meeting, plaintiff told Carty that ISS did not have the luxury as "you do in MICD of having a manager on these jobs." Carty understood this to be a put-down and a negative attitude. When an MICD professional named Keith Mollenkamp was assigned to a project called CLEAR, plaintiff, without informing Carty, called Mollenkamp's home office in Houston to inquire into his background and discuss his qualifications. Plaintiff openly criticized Mollenkamp's qualifications for the project. Plaintiff informed an MICD manager that expenses incurred by MICD personnel assigned to the CLEAR project were inappropriate. In another meeting, plaintiff requested removal of an MICD employee without first discussing the matter with Carty. Carty objected to plaintiff's unilateral decision to hold an all-day meeting with the whole project team without first checking with project team managers. Plaintiff

made other negative comments about MICD personnel assigned to ISS projects. Plaintiff's conflicts with Carty on the CLEAR project admittedly were work related, involving how decisions should be made and what those decisions should be.

In September of 1984, Carty sent a memorandum to Keirn and Rosenthal requesting that plaintiff be removed from CLEAR, citing alleged deficiencies in plaintiff's performance and concluding that plaintiff was a disruptive link in communications as well as "an unnecessary risk to the projects' successful completion." At the same time, Carty recommended that plaintiff be appointed ISS director of administration, noting that plaintiff "has exhibited some interesting characteristics which in my opinion make him qualified—perhaps even ideally suited—for this position." Carty discussed plaintiff's performance with Rosenthal prior to drafting the memorandum. Before the memorandum was sent, Carty gave a draft to Keirn and Rosenthal, each of whom had it for two to four weeks without suggesting any modification.

Plaintiff was removed from CLEAR. Before that time, Keirn and Rosenthal told him that he must improve his relationship with Carty and the MICD personnel. After plaintiff was removed from CLEAR, he met with James LaBorde, Andersen's managing partner of finance and administration, to whom the whole ISS function reported. LaBorde and plaintiff discussed plaintiff's differences with Carty. LaBorde told him that partners were in charge of the project and that his input was welcome, but that if he continued to confront Carty, plaintiff would "lose."

In late 1984, Keirn asked plaintiff to work on another joint MICD-ISS project, the "Human Resource Information Plan" (HRIP). Peter Pesce, Andersen's director of human resources, was the client or sponsor of the project. Carty controlled MICD personnel and Keirn controlled ISS personnel. Plaintiff expressed reservation and apprehension about handling the project because he could be required to work with Carty, whom he thought did not like him. Keirn responded that he believed plaintiff had the ability to handle the project and that plaintiff's position was secure, adding that in reporting directly to Keirn, plaintiff would be protected from Carty's bad feelings and animosity. As the project started, Pesce confirmed his confidence in plaintiff and strong desire to have plaintiff remain on the project. Pesce reassured him of his job security. Pesce's evaluation of plaintiff in 1985 stated that he looked forward to working with him on future projects. Keirn and Pesce reassured plaintiff that his course of action was approved by them.

Subsequently, at a lunch meeting with Phil Passantino, the MICD project manager, plaintiff allegedly tried to discuss possible problems in the way the project was going. Passantino took plaintiff's statements as personal attacks. Plaintiff went to Keirn after the meeting and expressed concern over Passantino's negative reaction. Passantino returned from the meeting and told Carty that plaintiff said he was disappointed with Passantino's management of the project. He alleged that plaintiff said "you MICD guys just come blasting in here for six months and leave a mess for us to clean up."

Carty requested plaintiff's personnel file. He said that he was "going to get this fucking guy" or a similar articulation. Carty also prepared an annual evaluation of plaintiff's performance. The evaluation, in part, focused on plaintiff's continuing inability to work with personnel. Carty sent a draft to plaintiff's supervisors in ISS and told them that he would hold the evaluation for two weeks and invited their comments. This negative evaluation was inconsistent with other evaluations of plaintiff by Keirn, Pesce, and Rosenthal, who graded his performance as "satisfactory-high," "above-average," and "satisfactory-high," respectively.

After receiving the Carty evaluation, plaintiff's supervisors met several times, focusing on plaintiff's problems in working harmoniously with MICD personnel. LaBorde decided plaintiff's inability to work with MICD personnel, as reported by Carty, was disruptive to projects on which he was working and summarily terminated him on May 6, 1985. Keirn, Rosenthal and Pesce concurred in the decision.

Plaintiff was given until August 15, 1985, to find other employment, but remained at Andersen through December 31, 1985. He received no warnings as defined in Andersen's three-warning policy and nothing contained in plaintiff's personnel file appears to constitute the necessary documentation of an oral, written, or final warning.

In granting Andersen's motion for summary judgment, the circuit court determined that plaintiff failed to establish a question of fact with respect to whether an employment contract existed upon which plaintiff would be entitled to base this action. For reasons which follow, we reverse and remand for trial.

I

Plaintiff asserts that Andersen's written and oral promises created enforceable employment contractual rights consistent with *Duldulao v. Saint Mary of Nazareth Hospital Center* (1987), 115 Ill. 2d 482, 505 N.E.2d 314 (*Duldulao*).

■ In *Duldulao*, our supreme court held that the general employment-at-will rule is a rule of construction which mandates only a presumption that a hiring without a fixed term is at will, which presumption can be overcome by demonstrating that the parties contracted otherwise. (*Duldulao*, 115 Ill. 2d at 489.) The court found that employee handbooks or other policy statements can create enforceable contractual rights where the traditional requirements for contract formation are present.

> "First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement. When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed." (*Duldulao*, 115 Ill. 2d at 490.)

In granting defendants' motion for summary judgment here, the circuit court found that there was no language clear enough in the Manual or in the Procedures from which to reasonably infer enforceable contractual rights as a matter of law. We disagree.

The summary judgment procedure is a salutory, yet drastic, means of disposing of litigation; it is an aid in the expeditious disposition of a lawsuit, but it may be allowed only when the moving party's right to such judgment is free and clear from doubt as a matter of law. (*Loyola Academy v. S & S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 271-72, 586 N.E.2d 1211; *Montes v. Hawkins* (1984), 126 Ill. App. 3d 419, 423, 466 N.E.2d 1271.) As we noted in *Montes*:

> "Summary judgment is recognized as a salutary procedure in the administration of justice [citation], but must be cautiously granted so that the respondent's right to trial is not usurped in the presence of material evidentiary conflicting facts and inferences. The function of the procedure is to determine the existence or absence of triable issues of fact, not to try them. [Citations.] The moving party for summary judgment must affirmatively show a clear legal right thereto, free from doubt. If any facts upon which reasonable persons may disagree are identified, or inferences may be fairly drawn from those facts leading to differing conclusions, the circuit court must deny the motion and direct [that] the resolution of those facts and infer-

ences be made at trial. [Citations.] When an agreement contains material terms capable of being understood in more than one sense and pleadings and affidavits conflict as to their meaning or are insufficient as bases upon which to determine their meaning as a matter of law, the circuit court must resort to an evidentiary hearing, rather than summary judgment proceedings, so that the parties may present their respective positions at trial as to the true intent ***." *Montes*, 126 Ill. App. 3d at 423-24.

In the present case, the Manual, the Procedures, and the written and oral promises, in their totalities, presented sufficient evidence upon which a trier of fact could infer and find enforceable contractual promises made by Andersen to plaintiff. Considering this evidence in a light most strictly against Andersen as movant, and most favorably to plaintiff as respondent to defendants' summary judgment motion (*Loyola Academy*, 146 Ill. 2d at 271), there was sufficient evidence from which the trier could reasonably infer and conclude that plaintiff was promised (1) he would not be terminated except for good cause, and (2) even in the event of a good-cause discharge, except in the case of very serious misconduct, the progressive three-warning policy would be followed.

A

■ Defendants claim that nothing in the Manual can be construed as a "clear" and "definite" promise that employees would not be discharged absent "good cause" and presents no promise of any specific procedures to be followed in the event that an employer chooses to dismiss an employee on the ground that the employee's conduct falls below the claimed good-cause standard. Further, defendants assert, the three-warning system was merely a "directional policy statement" to supervisors, which was nothing more than a "flexible framework for operational guidance," rather than a contractual obligation, and applied only to employees below the level of manager.

To the contrary, the Manual issued to every Andersen partner and employee required them to read and be "thoroughly familiar with the personnel policies contained" therein, accepting the responsibility for doing so within 10 days and acknowledging that fact by signing and returning the signature page to the personnel office because it was "extremely important." Managers are nowhere excepted. The introduction to the Manual advised the employee that the document "summarizes Firm policy included in the publications." At the beginning of the Procedures handout, the document is said to be intended to solve

"problems that are not completely answered" by the Manual. A reasonable inference may be drawn to the effect that the Manual and Procedures were intended to supplement each other, as well as to enunciate and clarify company policy. Also, the Procedures statement further advises the reader that where questions are not completely answered by the Manual, the personnel staff should be contacted and would provide employees with further information. The oral representations to plaintiff made with respect to employment security and discharge procedures thus appear to have been authorized by the Manual and the Procedures.

Further, the Manual in effect at the time of plaintiff's termination announced that "[t]he partners are committed to a policy and practice of deciding all matters relating to employment *** on the basis of qualifications and merit alone." Keirn, who at all relevant times was a partner and the head of ISS with the apparent authority to bind the firm, specifically admitted that Andersen had a policy of requiring good cause for discharge. In his deposition, George Koch, the ISS division personnel manager, reportedly told Andersen managers on several occasions between 1980 and 1986 that, consistent with this policy, they (the managers) would not be fired without warning and without good reason. Plaintiff allegedly was promised on other occasions that no one would be discharged except for just cause.

Having required all partners and employees to read, become familiar with and pursue the prescribed conduct and procedures, and to sign the acknowledgement of the employee's understanding of what was expected of him or her and of Andersen, the trier of fact could find that Andersen made enforceable contractual promises to plaintiff under the *Duldulao* formula. The circuit court's grant of summary judgment as a matter of law was error and must be reversed, and the cause remanded for trial.

### B

■ Defendants urge that the Manual does not provide for specific procedures to be followed in the event that the employer chooses to dismiss an employee for good cause, which is necessary to satisfy the *Duldulao* requirements. (*Tolbert v. St. Francis Extended Care Center* (1989), 189 Ill. App. 3d 503, 545 N.E.2d 384 (*Tolbert*).) The record is to the contrary.

The three-warning policy does prescribe specific disciplinary procedures to be used prior to discharging an employee. The Procedures document the established policy and practice whereby "greensheets" were to be executed by the employee's supervisor to document each

step of the progressive discipline policy ("three-warning" rule), and these written warnings were to be placed in the employee's personnel file. The Procedures also provide, in pertinent part, that, "1. When an employee shows a pattern of poor performance or misconduct, a warning procedure is implemented which may or may not result in a final termination ***. 2. The supervisor must give a verbal warning describing the poor performance or misconduct ***." Employees were to be told explicitly that the verbal consultation was to be considered as a warning.

The procedures also provide that the supervisor is to follow up on the verbal warning within two to three months. If there has been no change in the employee's performance, a second warning is to be given and documented. The Procedures mandate that if the behavior continues, a third and final warning is to be given as follows: "On _____ and _____, we discussed your tardiness problem. You have continued being late (give details), and I must give you a final warning. If this continues, or if there is any other infraction of Firm rules, we will terminate you."

From the foregoing it is clear that the procedures for termination were sufficiently provided in this case in accord with *Tolbert*.

## C

■ Finally, defendants assert plaintiff's termination was for good cause, and plaintiff received more than three warnings under any reasonable meaning of those terms. Defendants urge that plaintiff was fired for a good reason, because of serious conflicts with MICD management; that plaintiff had several warnings; it would be ludicrous to require the warnings to be reduced to a specific form; and, therefore, there was no breach of contract.

A trier of fact could find from the evidence that defendants, by occasionally suggesting to plaintiff that he should try to get along with Carty, did not discharge their specific and detailed obligations under the contract. The trier could also conclude from the evidence that the required warnings were never given. Also in conflict with defendants' assertion, it must be noted that plaintiff received positive communications and evaluations and his salary increased due to his good performance, incongruities which must be evaluated at trial.

## II

Plaintiff claims error in the circuit court's conclusion that there was no evidence of detrimental reliance and, therefore, no promissory estoppel.

## A

■ Plaintiff's promissory estoppel count alleged that defendants made promises on which he relied to his detriment, to his injury. The circuit court stated that plaintiff did not alter his position in any way based upon a promise. "The promise is the promise of employment, which is terminable at will." The court added that a supervisor has the right to reassign plaintiff from function to function and this did not operate to plaintiff's detriment, but was part of his obligation as an employee, and granted summary judgment as to this count.

The elements of promissory estoppel include (1) a promise unambiguous in terms, (2) with reliance thereon by the promisee, (3) with such reliance being expected and foreseeable by the promisor, and (4) with the promisee in fact relying on the promise to his injury. *Vincent DiVito, Inc. v. Vollmar Clay Products Co.* (1989), 179 Ill. App. 3d 325, 534 N.E.2d 575.

Plaintiff maintains that the promises made to him were clear and unambiguous, referring to the statements and writing which allegedly promised that he could not be fired without good cause and not unless the three-warning policy was followed. Plaintiff further relies on the statement made to him by Keirn regarding his job security and his protection from Carty.

Detrimental reliance is identified in that plaintiff relied on the promises as reasons for continuing his employment with Andersen in general, and on the HRIP project in particular. Plaintiff avers that he could have declined HRIP with no serious repercussions and points to Keirn's deposition testimony that plaintiff probably, although not certainly, would still be employed by Andersen today if he had refused the assignment. Further, plaintiff states that he failed to take affirmative acts to protect himself which he would have taken had the promises not been made.

A fact finder could have found sufficient evidence of detrimental reliance by plaintiff under these facts. Entry of summary judgment, therefore, was improvidently granted, for this reason as well.

## B

■ Defendants assert that the Statute of Frauds (Ill. Rev. Stat. 1989, ch. 59, par. 1 *et seq.*) bars plaintiff's claim because the representations upon which plaintiff allegedly relied were both oral and written and, thus, considered oral; therefore, promissory estoppel is inapplicable. (*Sinclair v. Sullivan Chevrolet Co.* (1964), 45 Ill. App. 2d 10,

17, 195 N.E.2d 250, *aff'd* (1964), 31 Ill. 2d 507.) We find, however, that the Statute of Frauds does not apply.

The Manual, Procedures and evidence of the good-cause requirement for discharge, as well as the three-warning policy, are sufficient writings to remove the contract from the statute. In ruling that policy statements may create enforceable contractual rights (*Duldulao*, 115 Ill. 2d at 490), the supreme court did not require that the policy statement be wholly in writing to be enforceable. Although *Koch v. Illinois Power Co.* (1988), 175 Ill. App. 3d 248, 529 N.E.2d 281 (*Koch*), holds that a contract partly oral and partly written is considered oral for its legal effect, neither the case nor the maxim properly applies here. *Koch* did not involve a *Duldulao* contract. Further, in *Koch*, plaintiff could remember neither the language used in making the alleged oral promise nor could he specify what contract protections were promised. Also, unlike the present case, the oral part of the contract in *Koch* contained essential terms. Here, the essential contract terms were written and were corroborated by the oral terms. Although plaintiff first learned of the three-warning policy through oral representations, the policy subsequently was reduced to writing during the time of his continuing employment, of which he claims to have been fully aware, and was in effect at the time of plaintiff's termination. The cause requirement, too, was reduced to writing both in the Manual, which promised that employment decisions would be based on "qualifications and merit alone," and in the Procedures, which provide that the three-warning policy applied "when an employee shows a pattern of poor performance or misconduct."

Lastly, the Andersen contract does not fall within the Statute of Frauds because it was capable of being performed within one year. (Restatement (Second) of Contracts §130, at 328-33 (1981); 2 A. Corbin, Corbin on Contracts §446, at 546-55 (1950); 1 H. Perritt, Employee Dismissal Law & Practice §4.45, at 366 (3d ed. 1992).) There was evidence here from which a fact finder could conclude that Andersen promised to retain plaintiff until there was just cause to dismiss him and not to terminate him until the three-warning policy had been followed. Clearly, it was possible at the time the contract was formed for plaintiff to have performed his job competently within one year and for Andersen to comply with the three-warning procedures within one year.

As to the alleged promises of plaintiff's job security, defendants assert that these were not unambiguous promises that plaintiff would not be fired in the face of repeated refusals to work harmoniously with MICD personnel. There is no conclusive record evidence to sup-

port these assertions as matters of law; they are more suitable for testing at trial, rather than in a summary judgment setting.

## III

Plaintiff contends that Carty should not be exonerated from responsibility for his allegedly unjustified actions by claiming a qualified privilege because (1) Carty's actions constituted intentional interference with contract and economic expectancy; (2) Carty was motivated by a malicious personal purpose rather than Andersen's interest; and (3) Carty's allegedly unjustified and malicious actions caused plaintiff's termination.

In counts III and IV, plaintiff claims that Carty intentionally interfered with his contractual relationship with Andersen (count III) and with his prospective economic advantage, or expectancy of a future relationship (count IV). The elements of these torts are similar: (1) a valid and enforceable contract or business expectancy, (2) defendant's awareness of the contract or business expectancy, (3) defendant's intentional and unjustified inducement of a breach of contract or interference with the expectancy which causes a subsequent breach or prevents the realization of the business expectancy, and (4) damages. *Chapman v. Crown Glass Corp.* (1990), 197 Ill. App. 3d 995, 1004-05, 557 N.E.2d 256.

The circuit court ruled that with regard to count III, plaintiff's failure to establish a *Duldulao* contract precluded a finding that there existed a valid and enforceable contract. The court also found that defendants were acting under the color of privilege and, therefore, malice must be shown to satisfy the third element and overcome the privilege. The court seems to have found that the privilege was a reason to grant summary judgment as to counts III and IV.

With respect to the circuit court's finding as to the *Duldulao* promises, our earlier discussion concludes otherwise, and needs no further elucidation here.

Plaintiff asserts that Carty was motivated by a malicious personal purpose rather than the interests of Andersen and urges error in the court's findings as to count IV which hold that Carty was acting under color of privilege. Because Carty allegedly was motivated by an intent to "get" plaintiff, rather than acting in the best interest of the employer, plaintiff maintains, his qualified privilege was destroyed. (*Stewart v. Ost* (1986), 142 Ill. App. 3d 373, 376, 491 N.E.2d 1306.) Plaintiff points to Carty's review of plaintiff's personnel files; Carty's assertion that he was going "to get that fucking guy"; Carty's keeping of notes on plaintiff, which, admittedly, he never did involving any

other Andersen employee; Carty's knowledge that his perceptions of plaintiff were different from those held by other managing partners; Carty's assertion that he was thinking about plaintiff's comments made in 1983 when he filled out the 1985 evaluation; evidence that Carty never evaluated any other ISS employee; and evidence that if it were not for Carty, plaintiff would not have been terminated. Plaintiff adds that Carty made false statements of fact, allegedly creating a material issue of fact. Plaintiff maintains further that Carty's allegedly unjustified and malicious actions caused plaintiff's termination. The causal connection between Carty and plaintiff's termination is inferentially shown by Carty's admission that plaintiff could be terminated as a result of his evaluation; by Keirn having told Koch that Carty was pushing for plaintiff's termination; and by Carty's adamancy that the termination proceed. Plaintiff asserts that Carty's influence and effect on the termination decision presents at least one genuine issue of a material fact, precluding summary judgment.

Defendants respond that Carty's evaluation was not tortious because the relevant portion is an undisputed true fact, which he was privileged to make. Defendants add that the evaluation was not interference because it did not cause plaintiff's termination.

■ Although as a partner Carty was privileged to use his best business judgment and discretion on behalf of Andersen in evaluating plaintiff's performance (*Mittelman v. Witous* (1989), 135 Ill. 2d 220, 552 N.E.2d 973), in order to overcome this privilege, plaintiff will be required to prove that Carty was acting solely for his own gain or solely for the purpose of harming plaintiff. (*Mittelman*, 135 Ill. 2d at 249.) Also, section 772 of the Restatement (Second) of Torts provides that the giving of truthful information does not interfere improperly with another person's contractual right. (Restatement (Second) of Torts §772, at 50 (1979).) Whether Carty's description of plaintiff's confrontations with MICD personnel was truthful information which Carty was privileged to pass along in the evaluation is a question of fact to be determined at trial, as is the question of whether the evaluation interfered with plaintiff's employment or merely touched off discussion, but did not cause the termination.

For the reasons set forth above, we reverse the grant of summary judgment in defendants' favor and remand this cause for trial.

Reversed and remanded.

McCORMICK, P.J., and SCARIANO, J., concur.