2001-NMCA-003

17 P.3d 440

Robert H. ETTENSON, Plaintiff–Appellee/Cross–Appellant,

v.

Lawrence J. BURKE and Mariah Media, Inc., a Delaware corporation, Defendants–Appellants/Cross–Appellees.

No. 19953.

Court of Appeals of New Mexico.

Dec. 7, 2000.

Certiorari Denied, No. 26,739, Jan. 19, 2001.

Jack N. Hardwick, Sommer, Fox, Udall, Othmer, Hardwick & Wise, P.A., Santa Fe, NM, for Appellee/Cross–Appellant.

Owen C. Rouse III, Frank T. Herdman, Rubin, Katz, Salazar, Alley & Rouse, a Professional Corporation, Santa Fe, NM, for Appellants/Cross–Appellees.

## OPINION

BOSSON, Judge.

{1} A fired corporate officer sued both his employer and his chief executive officer, who was the controlling shareholder of the corporation and his immediate supervisor, for damages arising from his termination. The lawsuit alleges a potpourri of creative legal theories sounding in both tort and implied contract. As a matter of first impression under New Mexico law, we hold that an employee can sue his supervisor, individually, for the tort of interference with contractual relations, meaning contractual obligations owed by the corporation to the employee, and that this tort can provide the foundation for a civil conspiracy action. We also explain why the instruction submitted to the jury for this claim was fatally flawed. Further, we decide under Illinois law that this employee had an actionable claim against the corporation for breach of an implied contract of employment. After discussing these and other theories of relief raised by the parties, including counterclaims, we affirm in part, reverse in part, and remand for a new trial.

## BACKGROUND

{2} Plaintiff, Robert Ettenson, was the associate publisher of Outside Magazine. He began working for Outside Magazine in 1985, and from then until 1994, he worked at the corporate headquarters in Chicago, Illinois. Outside Magazine is owned and published by Mariah Media, Inc.(Mariah). Ettenson's supervisor at Mariah was Lawrence J. Burke, president and chief executive officer of the corporation, who also owned 93 percent of Mariah's stock.

{3} In the early 1990's, Burke decided to move Mariah's headquarters from Chicago to

Santa Fe. The move concerned Ettenson, who was worried about being removed from Chicago, a commercial hub in the advertising world. Anxious that he would be at a competitive disadvantage if he moved to Santa Fe, Ettenson shared his concerns with Burke, and he requested to remain with the company in Chicago. Burke assured Ettenson he would be taken care of if he moved to Santa Fe along with the rest of Mariah's management.

{4} Between the time Burke announced the transition to Santa Fe and the time the move actually took place, other publishers approached Ettenson with lucrative job opportunities. Invariably, Ettenson informed Burke of these offers, and the two would discuss them together. One such job offer caused Ettenson to request a $30,000 salary increase from Burke to stay with Mariah, and Burke agreed in exchange for Ettenson tearing up the offer. That event prompted Burke, in April 1991, to issue Ettenson special non-voting stock in Mariah (hereinafter "phantom stock") with the idea that Ettenson would redeem the phantom stock at a sizeable gain when Burke sold Mariah sometime in the future. Burke's purpose in issuing the stock was to provide Ettenson with an incentive to remain with Mariah and not worry about annual salary increases. Both Burke and other Mariah officers repeatedly referred to the phantom stock as the source of Ettenson's future financial security.

{5} The move to Santa Fe also made Ettenson anxious about his future employment prospects if he were to lose his job. Burke reassured Ettenson that his concerns were unfounded because when he sold the magazine, they would both retire millionaires, and Ettenson would not have to worry anymore about work. In other conversations with Ettenson, Burke represented that his job with Mariah was "secure," and that Ettenson was part of the Outside family, as evidenced by Burke awarding him the phantom stock in Mariah.

{6} None of these verbal representations were reduced to writing, and Ettenson never had a written contract of employment with Mariah. In May 1994, Ettenson moved to Santa Fe. Despite the assurances of secure, long-term employment, on August 2, 1995, Burke summoned Ettenson into his Santa Fe office and summarily fired him.

{7} Ettenson was devastated by the termination. Under the terms of his stock agreement, title to the phantom stock reverted to Mariah, and Ettenson was entitled to be paid no more than book value for his vested shares, payable over a two-year period. Burke fired Ettenson at a time when he was incurring substantial personal expenditures. His wedding was to take place the following month and included nearly one hundred invitees. He was in the midst of constructing a new house. In short, Ettenson was caught in a vulnerable financial position. He alleges that the timing of his termination was no coincidence; it was part of a strategy of economic coercion. Burke was trying to squeeze him financially and force him to waive whatever legal claims he had arising out of the termination.

{8} According to Ettenson, Burke implemented his strategy in various ways. Two days after firing Ettenson, Burke caused Mariah to deliver a check to Ettenson that included compensation for his unpaid wages, accrued vacation, and eight weeks of severance pay, along with a "Termination Agreement Letter." When Ettenson asked Mariah officers about the legal effect of cashing the check, he was told that acceptance of the check would be construed as a release of all legal claims against Mariah. Despite needing the money, Ettenson refused to waive his legal claims, and returned the check. On September 5, 1995, Mariah finally paid Ettenson his final wages without conditions, approximately four weeks past the five-day limit prescribed by statute. *See* NMSA 1978, § 50–4–4(A) (1975). Ettenson still has not received any severance pay.

{9} To redress his summary termination and lack of severance compensation, Ettenson sued both Mariah and Burke asserting seven causes of action. Ettenson sued Mariah for breach of an implied contract of employment and for breach of an implied contract for severance pay, which the district court rejected on summary judgment. Ettenson also sued Burke individually for orchestrating a civil conspiracy to coerce him into

waiving his suit against Mariah. Mariah counterclaimed, alleging lost advertising revenues and improper billing attributable to Ettenson. After a trial, the jury returned a verdict for Ettenson on two counts: civil conspiracy and breach of an implied contract for severance pay. Ettenson was awarded $23,076.92 against the corporation for failure to pay his implied severance contract, and $725,000 against Burke individually on the civil conspiracy count. The jury rejected Mariah's counterclaim. All parties appeal.

## DISCUSSION

{10} Ettenson, Burke, and Mariah each appeal separate rulings of the district court on a variety of grounds. We consider the parties's arguments in order of their relative importance to the resolution of this case.

### Civil Conspiracy

{11} The jury awarded Ettenson $725,000 against Burke, individually, on his civil conspiracy charge. The jury apportioned $125,000 of the verdict as emotional damages and $600,000 as punitive damages. Those damages were assessed against Burke for his role in wrongfully inducing Mariah to breach its implied contract for severance pay and to withhold Ettenson's final pay past the statutorily prescribed due date, five days after termination. *See* § 50–4–4(A). Burke asserts eight points of error against the civil conspiracy verdict, which we reclassify into three groups. First, he challenges the theory of civil conspiracy and particularly a civil conspiracy to commit the tort of interference with contractual relations, arguing that it cannot apply to the facts of this case. Second, Burke maintains that the jury instruction on civil conspiracy and contractual interference was fatally defective. And third, Burke argues that the jury instructions impermissibly allowed for emotional and punitive damages, and failed to establish a causal connection between the conspiracy and the limited injuries for which Ettenson would be entitled to compensation. We disagree with Burke and concur with Ettenson on the first and third points of error. However, Burke persuades us as to the second argument regarding the flawed jury instruction, and ac-

cordingly, we reverse and remand for new proceedings consistent with this opinion.

### The Legal Sufficiency of the Civil Conspiracy Claim

{12} To establish Burke's liability for a civil conspiracy, Ettenson needed to demonstrate "(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts." *Silva v. Town of Springer*, 1996–NMCA–022, ¶ 25, 121 N.M. 428, 912 P.2d 304. Unlike a conspiracy in the criminal context, a civil conspiracy by itself is not actionable, nor does it provide an independent basis for liability " 'unless a civil action in damages would lie against one of the conspirators.' " *Armijo v. National Sur. Corp.*, 58 N.M. 166, 178, 268 P.2d 339, 347 (1954) (quoting *Pullen v. Headberg*, 53 Colo. 502, 127 P. 954, 955 (1912)). A civil conspiracy must actually involve an independent, unlawful act that causes harm—something that would give rise to a civil action on its own. *See Las Luminarias of the New Mexico Council of the Blind v. Isengard*, 92 N.M. 297, 300, 587 P.2d 444, 447 (Ct.App.1978). Our case law describes civil conspiracy as achieving an unlawful purpose or using an unlawful means to achieve a lawful goal. *See id.* The purpose of a civil conspiracy claim is to impute liability to make members of the conspiracy jointly and severally liable for the torts of any of its members. *See Beck v. Prupis*, 162 F.3d 1090, 1099 n. 18 (11th Cir. 1998) (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 46 (5th ed.1984)). Without an actionable civil case against one of the conspirators, however, an agreement, no matter how conspiratorial in nature, is not a separate, actionable offense. *See Armijo*, 58 N.M. at 177, 268 P.2d at 346. Burke argues there was no such independent, unlawful act in this case upon which to predicate the claim of civil conspiracy.

{13} Ettenson frames the independent, unlawful act as follows. He alleges that Burke conspired with Mariah's business manager and its attorney in an attempt to force Ettenson to waive his suit against Mariah. He

withheld money from Ettenson at the time when Ettenson needed it most; when he was unemployed and confronted with the costs of his house construction and imminent marriage. Most significantly, Ettenson charges that Burke induced Mariah to breach obligations it owed to Ettenson: an implied contract for Ettenson's severance pay and Ettenson's statutory right to receive his final pay within five days of his termination. Ettenson offers the breach of these obligations, and particularly Burke's inducement of that breach, as the independent, unlawful acts that make the conspiracy actionable. Because Ettenson argues the unlawfulness of the breached statutory right under a different legal theory, we treat it separately below. We first address Burke's inducement of the breach of Ettenson's implied contract for severance pay.

*Tortious Interference with Contract*

{14} Establishing tortious interference with contract is not easy. Ettenson had to prove that (1) Burke had "knowledge of the contract" between Ettenson and the corporation, (2) performance of the contract was refused, (3) Burke "played an active and substantial part in causing [Ettenson] to lose the benefits of his contract," (4) damages flowed from the breached contract, and (5) Burke induced the breach "without justification or privilege to do so." *Wolf v. Perry*, 65 N.M. 457, 461–62, 339 P.2d 679, 681–82 (1959). Not every interference leading to a breach of contract amounts to an unlawful act or a civil action; tort liability attaches only when the interference is without "justification or privilege." *Williams v. Ashcraft*, 72 N.M. 120, 121, 381 P.2d 55, 56 (1963). In causing one to lose the benefits of a contract, the tortfeasor must act either with an improper motive or by use of improper means. *See Diversey Corp. v. Chem–Source Corp.*, 1998–NMCA–112, ¶ 20, 125 N.M. 748, 965 P.2d 332. As we shall see, the question of Burke's privilege or justification to interfere, along with the other elements of tortious interference, is critical to this appeal.

{15} In framing the unlawful act underlying the conspiracy as tortious interference with contract, Ettenson's task was further complicated by the corporate setting: a corporate officer allegedly interfering with the contracts of his own corporation. Burke argues that tortious interference with contract is not legally cognizable when asserted against a corporate officer for interfering with the corporation's own contracts. Therefore, Burke maintains that Ettenson's civil conspiracy claim fails as a matter of law for want of an independent wrongful act. *See Salazar v. Furr's, Inc.*, 629 F.Supp. 1403, 1410 (D.N.M.1986) (holding that an agent of a corporation could not tortiously interfere with the corporation's employment contract).

{16} We acknowledge some support for the theory that a corporate officer is absolutely immune from suit for interfering with the contracts of his own corporation. *See, e.g., Gonzalez v. Gutierrez*, 694 S.W.2d 384, 388 (Tex.App.1985). The argument for absolute immunity is founded on a common law exception to claims for tortious interference, stated as follows:

> [T]he servant who causes a breach of his master's contract with a third person seems to stand in a wholly different position. He is not a stranger. He is the alter ego of his master. His acts are in law the acts of his employer. In such a case it is the master himself, by his agent, breaking the contract he has made, and in my view an action against the agent ... must therefore fail, just as it would fail if brought against the master himself for wrongfully procuring a breach of his own contract.

*Said v. Butt*, 3 L.R. 497, 505–506 (K.B.1920). But even adherents to this reasoning usually place limits on a corporate officer's immunity: that an officer can be liable when he acts outside his scope of authority. *See Wellington Sys., Inc. v. Redding Group, Inc.*, 49 Conn.App. 152, 714 A.2d 21, 31 (1998). *Said* readily admits of this limitation. *See Said*, 3 L.R. at 506 (premising immunity on "bona fide" authority to act).

{17} The prevailing view is not as Burke would have us believe. The majority of opinions recognize that a corporate officer is privileged to interfere with his corporation's contracts only when he acts in good faith and in the best interests of the corporation, as

opposed to his own private interests. The privilege is not absolute, but qualified. *See Embree Constr. Group, Inc. v. Rafcor, Inc.*, 330 N.C. 487, 411 S.E.2d 916, 924 (1992) (stating majority rule); *see also Chapman v. Crown Glass Corp.*, 197 Ill.App.3d 995, 145 Ill.Dec. 486, 557 N.E.2d 256, 262–63 (1990); *Gibson v. Adams*, 946 S.W.2d 796, 802 (Mo. Ct.App.1997); *Wampler v. Palmerton*, 250 Or. 65, 439 P.2d 601, 606–07 (1968); *Olympic Fish Prods., Inc. v. Lloyd*, 93 Wash.2d 596, 611 P.2d 737, 738–39 (1980) (en banc). *See generally* Alfred Avins, *Liability for Inducing a Corporation to Breach Its Contract*, 43 Cornell L.Q. 55, 58 (1957); Thomas G. Fischer, Annotation, *Liability of Corporate Director, Officer, or Employee for Tortious Interference with Corporation's Contract with Another*, 72 A.L.R.4th 492 (1989). This view is also embraced by the Restatement (Second) of Agency §§ 343–46 (1958), which characterizes an agent's tort liability to a third party in terms of a limited privilege.

{18} This qualified privilege exists because "[c]orporate officers or directors are privileged to interfere with or induce breach of the corporation's contracts or business relations with others as long as their actions are in good faith and for the best interests of the corporation." *Phillips v. Montana Educ. Ass'n*, 187 Mont. 419, 610 P.2d 154, 158 (Mont.980). Validating the privilege requires a court to delve into the motivating forces behind the officer inducing his corporation to breach its contractual obligations. In undertaking this task,

> [t]he question of good faith and whether the [corporate officer] believed the act was for the best lawful interests of the corporation must be determined as of the time the inducement took place. To determine these questions it is proper for the trier of facts to ascertain whether the accused [corporate officer] acted to satisfy personal feelings against the third party, or to serve his own private interest with no benefit to the corporation.

*Ong Hing v. Arizona Harness Raceway, Inc.*, 10 Ariz.App. 380, 459 P.2d 107, 115 (1969).

{19} Examples of such "private interest with no benefit to the corporation" may help illuminate the task of the trial judge in ruling on a motion for summary judgment or furnishing an appropriate jury instruction. *Id.* For example, tortious interference with a contract of employment is not privileged if motivated by a corporate officer's anger with the former employee for spurning his sexual advances. In a similar vein, the privilege has been overcome when a corporate official fired a key employee because he was personally interested in forcing a board member to sell him stock. *See Chapman*, 145 Ill.Dec. 486, 557 N.E.2d at 263–65. In the case of a corporate officer inducing a breach of his corporation's contract to sell herring roe, the privilege presented a question of fact for the jury because the officer personally gained from the breach through an independently-owned business that sold herring roe to the corporation. *See Olympic Fish Prods., Inc.*, 611 P.2d at 740.

{20} A qualified privilege is more attune with our own case law than a blanket provision of absolute immunity would be. *Cf. Stinson v. Berry*, 1997–NMCA–076, ¶ 18, 123 N.M. 482, 943 P.2d 129 (recognizing that corporate "agents are liable for their own tortious acts, regardless of whether the principal is liable"). Thus, we reject Burke's view that corporate officers are simply surrogates of the corporation, entitled to absolute immunity from suits for tortious interference with contract. Instead, we adopt the majority rule and hold that under New Mexico law Burke can be sued for tortious interference with Mariah's contractual obligations, or a conspiracy for that purpose, subject to Burkes's claim of qualified privilege to act in good faith for the best interests of the corporation. *See Phillips*, 610 P.2d at 157–58. In so doing, we reject Burke's first line of defense. We agree with Ettenson that his civil conspiracy claim rests on a valid, underlying cause of action—Burke's tortious interference with Ettenson's contract with Mariah—for which, if proven, Burke can be held liable individually along with the other members of the alleged conspiracy.

{21} We also observe that the question of privilege is often fact specific; so much so that we cannot pass judgment in this opinion on whether Burke's interference was privi-

leged. Also, neither party briefed the appeal in those terms. We note, however, that it is Burke's burden to plead and prove privilege as an affirmative defense. *See M & M Rental Tools, Inc. v. Milchem, Inc.,* 94 N.M. 449, 455, 612 P.2d 241, 247 (Ct.App.1980) (stating the approach was " 'appropriate to claims of tort liability for intentional interference with contractual or other economic relations' " (quoting *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.,* 283 Or. 201, 582 P.2d 1365, 1371 (1978) (in banc))). We also observe that a court cannot say, as a matter of law, that Burke was not acting in the best interest of the corporation by interfering with Ettenson's contractual claims simply because he was also a stockholder who stood to profit in tandem with the corporation. *See Lone Star Ford, Inc. v. McCormick,* 838 S.W.2d 734, 743 (Tex.App.1992).

*Conspiracy to Breach a Statutory Right*

■ {22} Ettenson's alternative theory for civil conspiracy liability rests on Burke's interference with his statutory right to be paid within five days of his termination. *See* § 50–4–4(A). Ettenson uses the criminal accessory statute to argue that Burke "procured" the corporation to violate the five-day limit for final pay which, under NMSA 1978, Section 50–4–10 (1937), carries a misdemeanor penalty. *See also* NMSA 1978, § 30–1–13 (1972) (making it a crime when a person "procures, counsels, aids, or abets" another in criminal activity). Ettenson urges that Burke's procurement of this misdemeanor violation by Mariah constitutes another underlying unlawful act that supports civil conspiracy liability. Ettenson's argument does not persuade us.

{23} Initially, we note that it would be unfair for this Court to hold Burke liable under this theory because Ettenson makes the argument for the first time on appeal. *See State v. Franks,* 119 N.M. 174, 177, 889 P.2d 209, 212 (Ct.App.1994) (holding that the appellate courts will not support a ruling on new arguments which require factual determinations). Further, Ettenson does not cite any authority for the proposition that violation of a criminal statute can give rise to a civil conspiracy. Our own research shows

little support for the proposition. New Mexico has only recognized a civil conspiracy when based upon an independent *civil* action against one of the conspirators. *See Armijo,* 58 N.M. at 178, 268 P.2d at 347. Section 50–4–4 creates a civil action for wages against the employer, in this case Mariah, but not against any individual. The majority of courts that have considered a civil conspiracy premised upon a criminal statute have demurred. *See Clay v. American Tobacco Co.,* 188 F.R.D. 483, 500 (S.D.Ill.1999). *Clay* summarized the problem as follows: "Because a civil conspiracy is a derivative claim, it requires an overt tortious act independent of the conspiracy. The criminal statutes, which do not create a private right of action, are not a valid basis for civil conspiracy liability in most states." *Id.* At this juncture, at least not without a more persuasive argument in its favor, Ettenson's argument does not persuade us to expand civil conspiracy beyond the tortious acts committed by one of the conspirators.

*The Jury Instruction*

■ {24} Burke's second line of defense assumes the validity of the civil conspiracy theory, but challenges whether the jury instruction faithfully captured all the elements of tortious interference with contract. Ettenson tendered the following instruction used at trial:

To establish the claim of civil conspiracy against Burke, Ettenson has the burden of proving each of the following contentions applicable to Burke:

1) That Burke acted together with another person with an agreement or mutually implied understanding to force Ettenson to settle the claims he made in this lawsuit; and

2) That Burke and others used, or caused others to use, one or more of the following unlawful means to force Ettenson to settle the claims he made in this lawsuit:

A) Withheld Ettenson's final pay for longer than five days after the date of the termination in violation of Section 50–4–4 N.M.S.A. (1978);

B) Withheld severance pay owed to Ettenson upon termination.

Ettenson also contends, and has the burden of proving, that he was damaged as a proximate result of the unlawful actions of Burke.

{25} Burke is correct. On its face, this instruction falls short. Section 2(B) of the instruction does not include the essential elements of a prima facie case of tortious interference with contract. *See M & M Rental Tools, Inc.*, 94 N.M. at 455, 612 P.2d at 247 (holding that plaintiff must establish prima facie case before defendant asserts privilege defense to tortious interference claim). The instruction never even mentions Mariah's contractual obligation to Ettenson. The instruction does not require the jury to determine whether a contract existed between Mariah and Ettenson, or more importantly, whether Burke knew that the contract existed. *See Wolf*, 65 N.M. at 461, 339 P.2d at 681 (requiring knowledge of contract before establishing liability). These questions had to be addressed before the jury could determine whether Burke was privileged to interfere. As the instruction reads, Burke could be held liable for personally withholding Ettenson's final pay and severance pay. But if anyone owed Ettenson this money, it was Mariah, not Burke. As a general rule, Burke cannot be held personally liable for the debts of the corporation or for its breach of contract. *See Kreischer v. Armijo*, 118 N.M. 671, 675, 884 P.2d 827, 831 (Ct.App. 1994) (holding that an agent is not prone to contract liability because an "agent for a disclosed principal is not a party to any contract entered into on behalf of the principal"). Burke is only liable when all the elements of tortious interference are present, and the jury must be so instructed.

{26} Additionally, and of no less significance, the instruction omits the important element of Burke's justification or privilege to interfere: whether Burke had a qualified privilege to interfere for the corporation's best interests. As given, the instruction is one-sided; it presents only part of Ettenson's prima facie case. The privilege defense is essential to the tortious interference instruction so that the jury can balance the competing interests at stake: shielding corporate officers when they act in good faith in furtherance of corporate goals, but withdrawing that protection if they use corporate power simply to serve their own, personal ends. *See Phillips*, 610 P.2d at 157–58; *see also M & M Rental Tools, Inc.*, 94 N.M. at 455, 612 P.2d at 247 (" '[A] recognized privilege may be overcome when the means used by defendant are not justified by the ... privilege.' " (quoting *Top Serv. Body Shop, Inc.*, 582 P.2d at 1371)).

{27} Further, as indicated above, civil conspiracy liability cannot be based on the violation of criminal statutes. Therefore, Section 2(A) does not state a valid cause of action. Although the violation of the statute may have value as evidence of Burke's improper motive, it is not a proper foundation for civil conspiracy liability.

{28} The instruction is fatally defective. As a result, the jury rendered a verdict based on what can only be described as a non-theory, or an incomplete theory, that does not afford the legal foundation necessary to support the judgment. Thus, this portion of the verdict is a legal nullity which we have no choice but to reverse. Because the theory is nonetheless supported by law, we reverse the verdict and remand for further proceedings to allow for reconsideration of the evidence under the appropriate legal standard.

*Preservation*

{29} Burke and Ettenson each raise preservation issues in regard to the civil conspiracy verdict. Ettenson argues that Burke could have presented a correct instruction with a more complete statement of the law on conspiracy and tortious interference. Ettenson's argument is unpersuasive. Burke did not need to tender a correct jury instruction as long as he made a sufficient objection to the court below. A proper instruction is only required "in case of a failure to instruct on any point of law." Rule 1–051(I) NMRA 2000. Burke repeatedly advised the court that the instruction first had to identify an independent tort and its elements before the jury could properly award damages for a civil conspiracy. Burke's objections were well-taken. The instruction failed to set forth an independent tort, either

by name or by elements, that would stand on its own apart from the claim of conspiracy. Burke renewed his objection after the court ruled on the instruction, and even tendered his own jury instruction, which the court rejected. We find that Burke's objection was sufficient to alert the district court to the error, although we acknowledge the awkward position in which the parties placed the court by virtue of waiting until the eleventh hour to clarify their theories. We cannot allow Ettenson to benefit from the very confusion he helped create. *See Cordova v. Taos Ski Valley, Inc.*, 121 N.M. 258, 263, 910 P.2d 334, 339 (Ct.App.1995) ("A party who has contributed, at least in part, to perceived shortcomings in a trial court's ruling should hardly be heard to complain about those shortcomings on appeal.").

{30} Burke, in turn, maintains that Ettenson waived any claim for tortious interference as his underlying tort because Ettenson "never characterized this claim as one for tortious interference with a contract." The record, however, reflects that Ettenson did present his theory to the district court in terms of tortious interference with contract. Although Ettenson's argument may have lacked clarity, Burke's counsel was made aware of this theory as a basis of liability. In fact, Burke's counsel specifically responded by arguing that a president of a corporation could not be sued for "tortious interference with contractual relations between the Plaintiff and the corporation," and cited *Salazar*, 629 F.Supp. at 1410 for the proposition. Burke's preservation argument is no more persuasive than Ettenson's.

*The Damages Awarded are Legally Supportable*

{31} As his third and final line of defense, Burke attacks the amount of the award against him. On the civil conspiracy claim, the jury awarded Ettenson $600,000 as punitive damages and $125,000 as emotional distress damages against Burke individually. The punitive damages were based on Burke's alleged attempt to "trick" Ettenson into waiving his rights to sue Mariah by sending him the Termination Agreement Letter. The letter never disclosed that Ettenson would waive his suit by cashing Mariah's original check, and according to Ettenson, if he had not retained legal counsel, he would have fallen into Burke's "trap." According to one view of the evidence, when the trick failed, Burke used economic coercion to attempt to force Ettenson's waiver by withholding Ettenson's final check and his severance pay. Similarly, Ettenson was not paid for his vested phantom stock until the full two-year period authorized in the stock agreement had expired, despite Mariah's initial offer in the Termination Agreement Letter to accommodate Ettenson's monetary needs "regarding the method of payment such as monthly, quarterly, or annually." Ettenson had requested to be paid in monthly installments, but he was not. Ettenson also testified regarding his emotional state after the termination. He stated that he was distraught, depressed, lost his appetite, stayed awake at night, and contemplated suicide for the first and only time in his life. He sought counseling and medical treatment. His doctor prescribed anti-depressants and sleeping medications which he took for a "good part" of the remainder of the year.

{32} Burke argues that despite the evidence going to emotional and punitive damages, the court erred as a matter of law because those damages were not contemplated by the parties as part of the alleged, underlying contract. Because the issue could arise on remand, we consider it here. Similar to establishing liability for civil conspiracy, damages arising from the civil conspiracy must bear a direct relationship to the unlawful act underlying the conspiracy, in this case tortious interference with contract. Burke correctly points out that in the ordinary breach-of-contract case, emotional and punitive damages are usually outside the scope of consequential damages, and the same is true for the limited statutory damages allowed under Section 50-4-4. Burke argues that it would be inconsistent to allow any different damages for a tortious interference with that same contract or limited statutory right. Burke has a point. *See* Keeton, *supra*, § 129 at 1003–04 (noting the anomaly of enlarged damages for tortious interference with con-

tract but recognizing that courts allow punitive and emotional damage recovery).

{33} However, New Mexico has allowed punitive damage awards in other instances of tortious interference with contracts. *See Christman v. Voyer,* 92 N.M. 772, 774, 595 P.2d. 410, 412 (Ct.App.1979), *overruled on other grounds by Sanchez v. Clayton,* 117 N.M. 761, 767–68, 877 P.2d 567, 573–74 (1994). Punitive and compensatory awards also find support in cases involving the tort's close relative, prima facie tort. *See Schmitz v. Smentowski,* 109 N.M. 386, 396, 785 P.2d 726, 736 (1990) (using the theory of tortious interference with contract to justify adopting prima facie tort). *Schmitz* recognizes that tortious interference with contracts cases "reflect the underlying theory of prima facie tort as applied to contractual relations—the underlying malicious motive of a defendant's actions, done without justification, makes an otherwise lawful act, competition, tortious." *Id. Schmitz* held that "punitive damages are contemplated under prima facie tort," and we believe the same is true here. *Id.* at 391, 785 P.2d at 731. Of course, as stated in *Schmitz,* punitive damages require a finding that Burke's conduct was malicious, willful, or wanton as described in our uniform jury instructions. *See* UJI 13–1827 NMRA 2000. Although punitive damages are awarded to punish and to deter others from acting in a similar fashion, we caution that they "must be reasonably related to the injury and to any damages given as compensation and not disproportionate to the circumstances." *Id.* (Definitions)

{34} Compensation for emotional distress is recoverable as well, as long as the distress is causally connected to the breach of the underlying contract, which in this case is limited to the emotional distress proximately caused by the breach of the implied contract for severance pay. It would be inappropriate for the jury to award Ettenson emotional damages, or punitive damages for that matter, which were caused by the overall stress of being fired. Additionally, to recover emotional damages, the distress must be severe and "of such nature that 'a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case.'" *Madrid v. Lincoln County Med. Ctr.,* 121 N.M. 133, 139, 909 P.2d 14, 20 (Ct.App.1995) (quoting *Folz v. State,* 110 N.M. 457, 469, 797 P.2d 246, 258 (1990)).

### Implied Contract of Employment

{35} The district court ruled against Ettenson on summary judgment with respect to his claim for an implied contract of employment. On appeal, Ettenson contends that he produced material evidence that should have permitted his claim to go to the jury. Because the representations creating the alleged contract took place in Chicago, the law of Illinois governs its validity. *See Ratzlaff v. Seven Bar Flying Serv., Inc.,* 98 N.M. 159, 162, 646 P.2d 586, 589 (Ct.App.1982) ("Courts of this state will determine the validity of a contract according to the substantive laws of the state where the contract was formed."). At the outset, we observe that courts from that region report that employment law in Illinois "remain[s] murky," *Lamaster v. Chicago & N.E. Ill. Dist. Council,* 766 F.Supp. 1497, 1499 (N.D.Ill.1991), unless such a construction conflicts with the settled policy of New Mexico.

{36} Under Illinois law, "an employment relationship without a fixed duration is terminable at will by either party." *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.,* 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314, 317 (1987). This presumptive rule of at-will employment may, of course, be overcome by demonstrating that the parties "agreed otherwise." *McInerney v. Charter Golf, Inc.,* 176 Ill.2d 482, 223 Ill.Dec. 911, 680 N.E.2d 1347, 1349 (1997). Such an agreement can be based on oral representations of an employer, as long as the terms of agreement are "clear and definite." *Id.* Whether the terms of an oral agreement are clear and definite presents "a threshold question of law to be determined by the court." *Harrell v. Montgomery Ward & Co.,* 189 Ill.App.3d 516, 136 Ill.Dec. 849, 545 N.E.2d 373, 376 (1989). In the case before us, the district court ruled against Ettenson because it concluded as a matter of law that Mariah's oral representa-

tions were not "clear and definite." *McInerney*, 223 Ill.Dec. 911, 680 N.E.2d at 1349.

**■■** {37} Ettenson argues that he had an implied employment contract with Mariah whereby he could only be terminated for cause. He maintains that the verbal assurances he received from Burke and Rex Ryan, Mariah's Chief Financial Officer, rose to the level of clear and definite promises, thereby creating an implied contract of employment. We examine the nature of the representations in the light most favorable to Ettenson to determine whether they present genuine issues of material fact that should be presented to a jury. *See Estate of Griego v. Reliance Standard Life Ins. Co.*, 2000–NMCA–022, ¶ 18, 128 N.M. 676, 997 P.2d 150 ("We can affirm the trial court's order awarding ... summary judgment only if the record reveals no triable issues of material fact and [a party] is entitled to judgment as a matter of law.").

{38} Our analysis begins with a conversation in which Burke talked Ettenson out of accepting a job offer from a rival publishing company. In critiquing the job offer, Burke said of his competitor, "He's the type of person who will walk into your office without warning, and fire you on the spot. You never have to worry about that happening here." We find this statement, if believed by a jury, to be clear and definite. Therefore, at a minimum, this promise created a factual basis upon which a jury could find a contract for advance notice (of unspecified length) of an upcoming termination, which is contrary to at-will employment.

{39} Ettenson also swore in an affidavit that Rex Ryan told him that he would be employed with Mariah until Burke sold the company. When negotiating benefits with Ettenson, Ryan asked him not to "push too much" on salary increases. Ryan advised him that the real financial reward "was not in [his] annual compensation," but rather in the value of his phantom stock "when Burke sold the company." Ryan then assured Ettenson that he would retire wealthy from his share of the phantom stock because Ettenson "was going to be with the magazine for as long as Burke owned [it]."

{40} According to Ettenson's affidavit, Burke ratified Ryan's representations. Once, when Ettenson threatened to resign, Burke dissuaded him by pointing out the value of his phantom stock. Burke told him that other publishers would not offer him stock; declaring, "[W]hen I sell the magazine you're going to be set for life." On another occasion, while discussing one of Ettenson's job offers, Burke reminded him that he was given stock so that they would both retire millionaires. Under the terms of the stock agreement, Ettenson could continue to hold the phantom stock only as long as he was employed with Mariah. In the same conversation Burke also told him, "Your career is secure with me." Burke repeated the assertion, "When I sell the magazine, we'll both retire millionaires," in less formal settings as well.

{41} These assurances were more than mere utterances of an "informal character which express[ ] only long continuing good will and hopes for eternal association." *Heuvelman v. Triplett Elec. Instrument Co.*, 23 Ill.App.2d 231, 161 N.E.2d 875, 878 (1959). As with other cases upholding implied employment contracts under Illinois law, they involved " 'critical one-on-one negotiation[s] regarding the terms of future employment.' " *Lamaster*, 766 F.Supp. at 1504 (quoting *Ohanian v. Avis Rent A Car Sys., Inc.*, 779 F.2d 101, 109 (2d Cir.1985)). The first assurance involved Ettenson's benefits, the next his possible resignation, and the last a job offer with a rival company. Each of these formal conversations focused on Ettenson's status with Mariah and shared a common thread: Ettenson would still be employed when Burke sold Mariah and would become wealthy by virtue of his phantom stock. We must consider the statements in their totality. *See Vajda v. Arthur Andersen & Co.*, 253 Ill.App.3d 345, 191 Ill.Dec. 965, 624 N.E.2d 1343, 1348 (1993). Given the repeated assurances and the context in which they arose, we conclude there was sufficient evidence on which a rational trier of fact could find enforceable contractual promises to the effect that Ettenson would continue to be employed by Mariah until Burke sold the company.

{42} Ettenson urges this Court to extend these enforceable promises to include the implied condition that he could only be fired for cause and after being given an opportunity to improve deficient performance. Although recent Illinois courts have not discussed how to flesh out the terms of an implied contract, there is Illinois precedent on this point. *See Molitor v. Chicago Title & Trust Co.*, 325 Ill.App. 124, 59 N.E.2d 695, 698 (1945) (holding that in cases of implied contracts for permanent employment, the court would infer the condition that an employee would keep his job "so long as the [employee] was able to do his work satisfactorily").

{43} In *Molitor*, the Illinois Appellate Court assumed an implied contract for permanent employment, and then decided what the parties intended by the term "permanent employment." *Id.* The employment relationship was no longer at will. On the other hand, the employee was not entitled to employment as long as he lived, regardless of the quality of his work. Instead, the Illinois court held that as long as the corporation "had work which the [employee] could do, and desired to do, and so long as the [employee] was able to do his work satisfactorily, the defendant would employ him, and that in that sense the employment would be permanent." *Id.*

{44} Applying *Molitor* to Ettenson's claims, if the jury were to find an implied contract of employment that was intended to cover Ettenson until Burke sold the company, then the jury could fairly infer from the terms of the contract that Ettenson could not be fired before that time, unless for cause. Thus, we agree with Ettenson's first suggestion. However, we decline to read into that contract, Ettenson's second claim, that he was to be allowed an opportunity to improve his job performance before being fired because it is not supported by the evidence.

{45} The district court's second reason for awarding summary judgment against the implied contract of employment claim was based on the Illinois statute of frauds, and its requirement that an agreement be in writing if the contract "is not to be performed within the space of one year from the

making thereof." 740 Ill. Comp. Stat. 8/1 (West 1998). A traditional exception to the statute of frauds is that a written contract is not required if "performance is possible by its terms within one year." *McInerney*, 223 Ill.Dec. 911, 680 N.E.2d at 1351. Ettenson argues that it was possible for Burke to have sold Mariah within a year, and therefore his implied contract of employment for that duration did not have to be in writing. *See Vajda*, 191 Ill.Dec. 965, 624 N.E.2d at 1351 (finding that a promise to retain employee until there was cause for termination, which necessarily involved a policy requiring advance warnings, was capable of being performed in a year).

{46} Recently, the Illinois Supreme Court called into question the validity of this traditional exception as applied to certain employment contracts. In *McInerney*, 223 Ill.Dec. 911, 680 N.E.2d at 1351–52, the Illinois Supreme Court examined this exception to the statute of frauds in the context of an oral contract for lifetime employment. Rejecting, as "hollow and unpersuasive," the notion that "the employee could, in theory, die within one year." *Id.* at 1351. The court found that a lifetime or permanent employment contract "[i]nherently ... anticipates a relationship of long duration—certainly longer than one year." *Id.* at 1352. Therefore, the court held that "a writing is required for the fair enforcement of lifetime employment contracts." *Id.*

{47} Burke urges the *McInerney* rationale upon all implied employment contracts, not just *permanent* employment contracts. As with *McInerney*, Burke argues that this Court should examine the subjective intent of the parties to determine whether the one-year exception to the statute of frauds applies. He maintains that because Ettenson's employment was for the "long term," Ettenson necessarily envisioned a contract lasting longer than one year, and under *McInerney* a writing was required to enforce it.

{48} No Illinois court has had occasion to interpret *McInerney*, 223 Ill.Dec. 911, 680 N.E.2d at 1351 and discern whether its holding requires examining "the actual course of subsequent events and the expectations of the parties," when determining whether the

statute's one-year requirement for a writing applies. Such an analysis was irrelevant before that opinion. No court has even adopted *McInerney's* narrow holding that a permanent contract of employment, by definition, exceeds the one-year rule and must be in writing. Thus, we are left with "the responsibility of making a best guess of what the Illinois Supreme Court would do in similar circumstances." *Lamaster*, 766 F.Supp. at 1499.

{49} We find it significant that before *McInerney* discussed the statute of frauds, the court clarified two important issues for interpreting implied employment contracts: consideration and mutuality of obligation. *See McInerney*, 223 Ill.Dec. 911, 680 N.E.2d at 1349–50. For years, the appellate courts in Illinois had been divided over how to handle these issues, and it was not until *McInerney* that controlling guidance was forthcoming. Are we to consider these discussions *obiter dicta*, points of law made nearly useless, if not obsolete, by a newly-minted statute of frauds? We think not. Considering that the vast majority of implied employment contracts are of uncertain duration and are broken well past a year of their making, it makes sense that the court intended to resolve these legal issues for their use in other instances of implied contract; contracts that did not implicate lifetime employment, and therefore would not be barred by *McInerney's* holding on the statute of frauds.

{50} Therefore, the holding of *McInerney* appears to apply primarily to lifetime or permanent employment contracts. As the three dissenting Justices pointed out, "only a 'distinct minority' of cases" have applied the statute of frauds in such a restrictive manner, even to permanent, lifetime contracts. *Id.*, 223 Ill.Dec. 911, 680 N.E.2d at 1353 (Nickels, J., dissenting, joined by Miller & McMorrow, JJ.) (citation omitted). It is not for this Court to impose additional restrictions on the law of Illinois. Unlike a lifetime employment contract, which practical people would naturally want to last more than one year, Ettenson's implied contract was to last only until Burke sold the company so that they could all retire millionaires. Presumably, both Burke and Ettenson would want

this to occur sooner rather than later. There is no indication that this could not have taken place in less than a year, nor that Ettenson knew, or could have known, that the sale would not occur within that time. Accordingly, we hold that the Illinois statute of frauds does not bar enforcement of Ettenson's implied contract of employment with Mariah.

**Implied Contract for Severance Pay**

{51} Burke argues that the jury award for an implied contract for severance pay was based on legally insufficient evidence. Apparently, this claim was litigated under New Mexico law, and on appeal there were no assertions that Illinois law governs this claim. Burke contends that by rejecting the terms of the severance pay offered in Mariah's "Termination Agreement Letter," Ettenson failed to prove the element of mutual assent to any such implied contract. *See* UJI 13–816 NMRA 2000. This letter agreement, however, is not the contract that Ettenson sued upon for severance pay.

{52} Ettenson alleged an implied contract theory based on his annual benefit negotiations, and Mariah's customary pattern, practice, and policy regarding severance. At trial, Ettenson testified that during his annual compensation negotiations he was led to believe that he was entitled to severance pay. Mariah never informed him that severance was conditional in any manner. Ettenson testified that if he had been informed that his severance pay was conditional, he would have negotiated for a higher salary. In reviewing a sufficiency of the evidence claim, we " 'resolve all disputed facts in favor of the successful party, indulge all reasonable inferences in support of a verdict, and disregard all evidence and inferences to the contrary.' " *Coates v. Wal-Mart Stores, Inc.*, 1999 NMSC 013, ¶ 46, 127 N.M. 47, 976 P.2d 999 (quoting *Clovis Nat'l Bank v. Harmon*, 102 N.M. 166, 168–69, 692 P.2d 1315, 1317–18 (1984)). In light of this testimony, the jury had before it sufficient evidence to agree with Ettenson and find an implied contract with regard to severance pay. *See* UJI 13–816.

### Mariah's Counterclaim for Lost Advertising Revenue

{53} Mariah contends that Ettenson was responsible for $2.4 million in lost advertising revenue from its Southern California office. The court dismissed this count of the counterclaim due to the lack of particularized evidence on causation. Mariah argues that material facts were presented on the issue of causation sufficient to preclude summary judgment. We will affirm an order granting summary judgment when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See Silva*, 121 N.M. 428, 912 P.2d 304, 1996–NMCA–022, ¶ 5.

{54} The "circumstances under which an employer can maintain a negligence action against an employee are limited." *Daddow v. Carlsbad Mun. Sch. Dist.*, 120 N.M. 97, 115, 898 P.2d 1235, 1253 (1995) (Minzner, J., concurring in part and dissenting in part). The need for discretion inherent in executive decision-making limits our ability to articulate a standard of care and therefore a duty that would apply to claims of negligence in this context. Even when negligence is demonstrated in executive decision-making, a plaintiff must demonstrate that the negligence caused specific loss. *See Brown v. United Cerebral Palsy*, 278 N.J.Super. 208, 650 A.2d 848, 852 (Law Div.1994).

{55} Mariah attempted to overcome summary judgment by filing an affidavit from Burke that states Ettenson was responsible for the Southern California office, sales slumped there, and Ettenson's management skills were causing some discontent with employees and customers. The proof requirements are strict for negligence actions in the context of business losses caused by poor management, and courts considering the liability of discretionary decision-makers have held that "[p]roximate cause of damage cannot be demonstrated by showing negligence and poor financial conditions. Because so many other factors may account for poor economic performance, a suing employer must demonstrate a specific causal link." *Id.* In this case, the issue of causation was a threshold question of law to be determined by the court. *See Rekart v. Safeway Stores, Inc.*, 81 N.M. 491, 492, 468 P.2d 892, 893 (Ct.App.1970) (holding that in appropriate cases, causation is a question of law). By failing to identify a single act of negligence which caused a discrete, identifiable business loss, Mariah fell short of its burden. The district court correctly awarded summary judgment to Ettenson.

### Misrepresentation and Failure to Disclose

{56} Ettenson urges the Court to reinstate his claims of negligent misrepresentation, negligent failure to disclose, and fraudulent failure to disclose that the district court dismissed. These causes of action attempt to revive Ettenson's closely related fraudulent misrepresentation claim; a claim that was submitted to the jury and rejected. Because Ettenson has not cited any authority supporting the application of these legal theories to the facts of this case, we conclude that these causes of action are without merit.

### CONCLUSION

{57} For the reasons discussed above, we reverse Ettenson's civil conspiracy verdict and reinstate Ettenson's claim of an implied contract of employment. We affirm all other issues raised by any party on appeal, and remand for further proceedings in accordance with this opinion.

{58} **IT IS SO ORDERED.**

WECHSLER, and ARMIJO, JJ., concur.