**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2017-NMCA-032

Filing Date: December 29, 2016

Docket No. 34,662

JEFFREY MARTINEZ,

    Petitioner-Appellant/Cross-Appellee,

v.

ANGELA MARTINEZ,

    Respondent-Appellee/Cross-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Matthew J. Wilson, District Judge**

The Zamora Law Firm
D. Diego Zamora
Santa Fe, NM

Wray & Girard PC
Katherine A. Wray
Albuquerque, NM

for Appellant

The Okon Law Firm
Christa M. Okon
Santa Fe, NM

for Appellee

**OPINION**

**SUTIN, Judge.**

**{1}** Husband Jeffrey Martinez and Wife Angela Martinez were divorced in May 2011. In the years following the divorce, the parties have engaged in a protracted and bitter dispute over alleged violations relating to court orders, spousal support, child support, property

1

division, and attorney fees. Husband appeals (1) a contempt order entered by the district court in connection with enforcement of a spousal support award to Wife and awarding attorney fees to Wife, (2) the admission of certain evidence during the hearing on spousal support, and (3) the denial of Husband's request for additional time to file proposed findings of fact and conclusions of law and a motion to reconsider. Wife cross-appeals a grant of summary judgment denying her community property interest in settlement proceeds Husband obtained in an insurance bad faith action that alleged the mishandling of a claim involving community property insured with community funds.

**{2}** We reverse and remand based on Wife's cross-appeal and hold that the district court erred in categorizing the settlement proceeds as Husband's separate property. Because our decision regarding the cross-appeal necessarily impacts the parties' respective finances, we similarly reverse the spousal support award and remand for further proceedings. Although our reversal obviates the need to address Husband's first and third issues on appeal, we address these arguments regarding certain discretionary matters for clarity on remand.

## BACKGROUND

**{3}** Because our opinion focuses primarily on Wife's claim that she is entitled to a share of the settlement proceeds as community property, we limit our recitation of the facts in this background section to those necessary for narrative clarity and to address the relevant issues. Additional facts will be discussed throughout as needed.

**{4}** Husband filed for divorce from Wife in April 2010. In the months following Husband's filing, the parties made numerous allegations against each other. Husband alleged, among other averments, that Wife violated the temporary domestic order (1) when she took Husband's clothes to Goodwill, (2) when Wife and the parties' son allegedly assaulted Husband's parents, and (3) when Wife and their children broke a television and left it outside of the marital residence. Wife alleged, among other averments, that Husband (1) abused her and their children, (2) removed community property from the marital home while she and the children were not present, and (3) misconstrued the altercation between their son and Husband's parents and that, in fact, their son was defending himself and Wife.

**{5}** During this same tumultuous time frame, in June 2010, Husband's truck, which was community property, was destroyed in a fire. Husband made a claim with Allstate Insurance Company, which was denied. Thereafter, Husband filed a bad faith claim against Allstate, *see State Employees Credit Union v. Martinez and Martinez v. Allstate Insurance Co.*, No. D-101-CV-2011-00694, which ultimately settled on September 7, 2011.

**{6}** During the course of this case, Wife had numerous attorneys and, at times, appeared pro se. When appearing pro se, Wife struggled to comply with the Rules of Evidence and Rules of Civil Procedure, and the district court attempted to explain concepts and otherwise accommodate Wife when possible. An initial merits hearing spanned four days, in part to give Wife an opportunity to review documents and consult with an attorney.

**{7}**     After a hearing in May 2011, the district court entered a decree of dissolution of marriage and entered an order on the distribution of community assets, community personal property, child support, and spousal support. In the order, filed in June 2011, the court addressed the marital residence, college fund accounts, certain debts and offsets, tax refunds, when the parties may respectively claim their minor son as a dependent, and a retirement account. The court took under advisement the child support and spousal support issues.

**{8}**     In July 2012 Wife filed a motion to impose a constructive trust on insurance proceeds and to set child and spousal support. In the motion, Wife addressed a $250,000 insurance check from Allstate in settlement of Husband's bad faith claim and for damage to his truck. Wife argued that the truck was community property, that the settlement proceeds were community property, and that one-half of those proceeds should have been awarded to her. She sought a constructive trust for one-half of the insurance proceeds, minus attorney fees, and requested that those funds be placed in the court registry. In her motion, Wife also sought spousal and child support awards in appropriate amounts and asked that those awards be retroactive.

**{9}**     In response to Wife's motion, Husband argued that Wife "actively conspired with Allstate and, as a result, her conduct, in part, played a significant part in the decision by Allstate to wrongfully deny [Husband's] property damage claim under his Allstate automobile policy." Husband accused Wife of committing "deceptive actions against the community" as evidenced by a letter from Allstate to Wife regarding Husband's claim. In the letter, Allstate employee Bruce Zinzer sent Wife a copy of an inventory submitted by Husband with a note to Wife that stated, "Let me know what you think." Husband also asserted that Wife, when interviewed by Allstate's counsel regarding Husband's insurance claim,[1] stated that Husband was making a fraudulent claim for personal property damages. Husband argued that Wife's conduct was aimed at denying the community the benefit of insurance coverage under the Allstate policy, and thus she should not be rewarded with any interest in the proceeds.

**{10}**     Husband's arguments related to the insurance proceeds dispute rested primarily on *Delph v. Potomac Insurance Co.*, 1980-NMSC-140, 95 N.M. 257, 620 P.2d 1282. In *Delph*, the husband and the wife owned a residence as community property. *Id.* ¶ 1. The residence was insured, and both the husband and the wife were named on the policy. *Id.* The wife moved out of the residence and sought a dissolution of marriage. *Id.* ¶ 2. The wife was granted a divorce and was awarded the residence. *Id.* However, prior to entry of the divorce decree, the husband intentionally set fire to the residence. *Id.* ¶ 3. The wife sought to recover proceeds under the insurance policy for damages caused by the fire, but the insurer refused to pay her, contending that "[the] husband's arson constituted 'fraud' by the 'insured' and

---

[1] In the briefing, Wife refers to her interview as a "statement under oath." In the district court, the interview was referred to as an "examination under oath" or a "statement under oath."

that the policy coverage was vitiated by the fraud." *Id.* ¶ 4. The wife brought suit against the insurer, the district court granted summary judgment in favor of the insurer, and the wife appealed. *Id.* ¶ 5. On appeal, our Supreme Court considered "whether the intentional burning of a community residence by one spouse will bar recovery by an innocent spouse under a fire insurance policy issued to the community." *Id.* ¶ 6.

**{11}**     In resolving the question on appeal, the Court in *Delph* first held that the residence as well as the insurance policy were community property. *Id.* ¶ 9. The Court, however, noted that "New Mexico courts have segregated out the interests of spouses in community property when it has been necessary to do so in order to avoid injustice." *Id.* ¶ 10. Because the parties' interests were capable of being segregated, the Court held that "both logic and justice mandate[d] that the [wife] should be entitled to recover up to one-half of the policy limits in order to compensate for the damages resulting from the fire." *Id.* ¶ 11. The Court stated that in New Mexico a "spouse who commits a separate tort is individually liable for damages arising out of the tort and that the separate (or segregable) assets of the innocent spouse may not be reached to satisfy the liability arising out of the tort." *Id.* ¶ 13. In deciding whether the husband's act of arson was a "community" or "separate" tort, the *Delph* Court considered "whether the act in which the spouse was engaged at the time of the tort was one which was of actual or potential benefit to the community." *Id.* ¶ 14. According to the Court, "[i]f it was of benefit, the tort is a 'community' tort, and thus a community debt. If the activity in which the tortfeasor spouse was engaged was of no benefit to the community, the tort is a 'separate' tort and thus a separate debt." *Id.* Ultimately, the Court held that the husband did not engage in an act that could be of benefit to the community, and thus his responsibility for the fraud was separate. *Id.* While the husband's actions could void his own interest in the policy, his fraud "[did] not void the policy as to [the wife]." *Id.*

**{12}**     Husband argued that *Delph* controlled the issue in this case because Wife's alleged scheming with Allstate could not be construed to benefit the community. He argued that Wife had a bad motive, and her sole purpose in "surreptitiously communicating" with Allstate was to harm Husband. Husband's position was that Wife's actions voided her interest in the Allstate policy, and thus voided her interest in the settlement proceeds.

**{13}**     In her reply, Wife admitted that she informed Allstate of Husband's practice of forging documents, but also asserted that Husband had initially told authorities that Wife and/or the parties' sons were responsible for having damaged the truck. She argued that because neither party was ultimately found to have caused the loss to the property and because Wife did not commit a tort, *Delph* did not apply.

**{14}**     The district court issued an order on Wife's motion regarding the settlement proceeds in November 2012. The court found that the truck was a community asset but did not have sufficient information regarding whether Wife's conduct contributed to Allstate's decision to deny Husband's property damage claim. The court continued taking the matter of spousal support under advisement pending a decision regarding the Allstate proceeds. At the same time, the court stated that "[a]s a separate issue and regardless of whether [Wife] has a right

4

to share in the Allstate proceeds, the [c]ourt is not foreclosing spousal support, pending testimony of [Wife's] treating doctors as to her physical condition and her ability to earn income."

**{15}**     Thereafter, in May 2013, Wife filed a motion for summary judgment on division of the Allstate settlement funds. Wife set out fifty-four statements of fact. Among those facts were the following. The truck was bought with community funds, was insured with community funds, and both Husband and Wife were named insureds. Bruce Zinzer, the Allstate employee who handled the personal property damage aspect of the claim, reached out to Wife because she was a named insured. When asked about Husband's reputation for honesty, Wife gave her "candid opinion of [Husband's] historical lack of truthfulness, based on examples from her life with [Husband]." Allstate provided Wife with Husband's inventory of items in the truck, and Wife informed Allstate that some of the items would not have been in the truck and that others did not have the value claimed by Husband. When asked by Allstate's attorney, Mark Klecan, during an examination under oath about Husband's reputation for honesty, Wife answered the question by referencing "police reports and an event involving [Husband's] lying to his probation officer." When asked for any other examples or instances of Husband's reputation for honesty or truthfulness, Wife referenced instances where Husband allegedly stole inventory from his employers. Although Klecan stated under oath that Wife's position was the primary reason for the delay in payment, Zinzer did not believe that Wife's input caused the denial of the claim. Wife also highlighted a number of other errors and omissions by Allstate in handling the claim, including Allstate's failure to hire a fire investigator, failure to independently obtain the police report, and failure to respond to Husband's attorney's letters.

**{16}**     Further, Wife denied playing a significant role in Allstate's denial of the claim and argued that it would be against public policy to force her to unconditionally support Husband's claims in order to be entitled to her share of the proceeds, even when she suspected Husband's claim to be fraudulent. She also argued that Allstate denied the claim because it suspected fraud based on Husband's actions and that any bad faith claims handling by Allstate was largely due to Allstate's failure to adhere to accepted claims-handling protocols in a timely manner. Lastly, Wife argued that *Delph* did not apply because her candor and truthfulness to Allstate is not a deliberate tort that failed to benefit the community.

**{17}**     Husband responded that many of Wife's "facts" were immaterial because Zinzer handled the claim related to the property inside of the truck, not the claim regarding damage to the truck itself. Husband highlighted testimony from Zinzer that Zinzer believed that Wife was "actively working with [him] to get this claim denied[.]" Husband, again relying on *Delph*, argued that the settlement proceeds were not a community asset because Wife's wrongful conduct was intended to deny the community a benefit under the Allstate insurance policy.

**{18}**     In August 2013 the district court denied Wife's motion for summary judgment

5

regarding the settlement proceeds, finding that, but for Wife's actions, Allstate would have had a different take on how to address the claim. It held that because of Wife's cooperation and statements to Allstate, Allstate chose to deny Husband's claim that gave rise to the bad faith action against Allstate. According to the court, a bad faith claim did not exist before Wife's participation, and the bad faith claim arose because of Wife's willing participation. Shortly afterward, in October 2013, the case was reassigned to another district court judge who handled the case up to this appeal.

**{19}** Husband filed a motion for summary judgment in February 2014 on the Allstate settlement proceeds. In support of his motion, Husband stated that the district court entered an order denying Wife's motion for summary judgment on division of the settlement proceeds, and Husband specifically outlined the findings of the court. Husband again argued that Wife's bad actions prohibited her from claiming a portion of the settlement proceeds. Alternatively, Husband argued that the settlement proceeds were separate property under NMSA 1978, Section 40-3-8(A) (1990). In response, Wife did not dispute Husband's material facts but argued that those facts were not sufficient to give Husband unfettered access to the funds. She incorporated by reference her arguments in her motion for summary judgment as to why the funds should be treated as community property and again disputed the relevance of *Delph*. She argued that while she "respectfully disagreed with the [court's] determination [on her motion for summary judgment], she did not appeal the determination because the funds would be the only source available to satisfy a lump sum [spousal support] award." She also argued that, even accepting Husband's contention that the funds were his separate property by virtue of the court's ruling on Wife's motion for summary judgment as true, the funds could and should be used in granting lump sum spousal support.

**{20}** During the hearing on spousal support, child support, and the allocation of the settlement proceeds, before the judge to whom the case was reassigned, Wife's attorney indicated that there was no contest as to the nature of the proceeds because "[the original judge] clearly [set] the money over to [H]usband." She stated that, although she thought the prior ruling on the settlement proceeds was "mind-boggling[,]" she did not appeal it because any lump sum spousal support would "have to come from somewhere if [it was] to be made at all." In light of the prior ruling, Wife did not object to the proceeds being treated as Husband's separate property based on the expectation that she would be receiving a lump sum spousal support payment from the proceeds. The court subsequently granted Husband's motion for summary judgment on the settlement proceeds essentially on the same grounds used to deny Wife's motion for summary judgment, adding a handwritten caveat that the proceeds not be used pending the court's decision on spousal support.

**{21}** After the court took evidence de novo from the parties on the matter of spousal support in August 2014, the court, in November 2014, ordered that Husband pay Wife a lump sum of $42,000 in spousal support, less amounts previously paid, plus $1,000 per month until further order of the court. In December 2014 the district court declined to stay its order awarding spousal support or to grant an extension for Husband to file a motion for reconsideration and requested findings of fact and conclusions of law. In March 2015 the

6

district court entered an order of contempt after granting Wife's motion to show cause for Husband's failure to comply with the court's order for spousal support. Also, in March 2015, the court ordered Husband to pay $10,000 in attorney fees and costs in addition to the attorney fees previously paid by Husband. This appeal followed.

## DISCUSSION

### I.      The Settlement Proceeds

**{22}**    As already indicated, we begin by addressing Wife's cross-appeal because the designation of the settlement proceeds as separate or community property necessarily impacts the appropriateness of the district court's spousal support award, which should be based in part on the parties' relative assets and needs. *See* NMSA 1978, § 40-4-7(E)(2), (4), (6), (7) (1997) (stating that when determining spousal support, the court must consider, in relevant part, "the current and future earnings and the earning capacity of the respective spouses[,]" "the reasonable needs of the respective spouses[,]" "the amount of the property awarded or confirmed to the respective spouses," and "the type and nature of the respective spouses' assets").

**{23}**    The standard of review in this case is complicated. We note that the orders from which Wife appeals are related to summary judgment as to the Allstate settlement proceeds, which we review de novo. *See Beggs v. City of Portales*, 2009-NMSC-023, ¶ 10, 146 N.M. 372, 210 P.3d 798. In general, we review the district court's equitable distribution of assets and liabilities for abuse of discretion. *See Arnold v. Arnold*, 2003-NMCA-114, ¶ 6, 134 N.M. 381, 77 P.3d 285. However, even when the appellate courts "review for an abuse of discretion, our review of the application of the law to the facts is conducted de novo. Accordingly, we may characterize as an abuse of discretion a discretionary decision that is premised on a misapprehension of the law." *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 7, 127 N.M. 654, 986 P.2d 450 (alteration, internal quotation marks, and citations omitted). Additionally, while the district court has broad discretion to divide community property, the threshold question of whether settlement proceeds are community property is a question of law that we review de novo. *See Arnold*, 2003-NMCA-114, ¶ 6 ("[T]he threshold question of whether [the h]usband's accumulated vacation leave and sick leave are community property is a question of law, which we review de novo.").

**{24}**    As we more fully discuss later in this opinion, the district court erred as a matter of law in misapprehending and misapplying *Delph* to the facts of this case and in determining that the settlement proceeds were separate and not community property. Wife, as a co-insured, responded to Allstate's investigative questioning. Nothing in the record, including the court's findings, shows or permitted a rational, reasonable inference that in doing so Wife acted with a malicious or otherwise tortious wrongful intent or motive to deprive the community of a community asset.

### A.      The Parties' Arguments

7

**{25}** We focus on Wife's argument on cross-appeal that as a matter of law her conduct did not deprive her of her community interest in the settlement proceeds.

**{26}** In arguing that insurance and community property law support her right to share in the bad faith settlement proceeds, Wife points to case law addressing community interests in insurance proceeds. *See Harris v. Harris*, 1972-NMSC-005, ¶¶ 8, 10, 83 N.M. 441, 493 P.2d 407 (holding that "the policy itself, including the right to receive the sum named therein . . . was community property during coverture" and that "[d]ecedent[-husband], being the owner of half of the policies, had the right to dispose of his half interest in the proceeds as he pleased"); *Hickson v. Herrmann*, 1967-NMSC-083, ¶¶ 8, 18, 77 N.M. 683, 427 P.2d 36 (holding that an insurance policy on the life of the parties' minor child bought with community funds during the marriage, though the husband continued to make payments on the policy after divorce, was community property and noting that while "[t]he proceeds were not paid during marriage[,] . . . the right to the proceeds was obtained during marriage[, and that] right was not changed and was not divided upon the divorce"); *In re Miller's Estate*, 1940-NMSC-021, ¶ 12, 44 N.M. 214, 100 P.2d 908 (holding that "the proceeds of an insurance policy obtained after marriage and payable to the estate of the husband is community, because [it was] paid for out of the community funds"); *Dydek v. Dydek*, 2012-NMCA-088, ¶¶ 42, 59, 62, 288 P.3d 872 (holding that the former wife had a sufficient interest in the husband's bad faith claim to justify her request for the court's appointment of a receiver but did not address whether a bad faith action was separate or community property). Wife argues that "insurance law generally holds [that] insurance proceeds arising from a policy owned by both parties belong to the parties equally." She asserts that "because the truck and policy insuring it were both community assets, any recovery for bad faith claims handling likewise derived from the breach by Allstate of a contractual duty owed to the community and should therefore be deemed a community asset."

**{27}** Wife then argues that even if her communications to Allstate contributed to Allstate's denying payment as to the truck, she is entitled to a community property share in the settlement funds because community property assets are divisible without regard to a respective spouse's fault. She relies on *Medina v. Medina*, 2006-NMCA-042, ¶ 13, 139 N.M. 309, 131 P.3d 696, which held that injecting "an element of moral fault into the rules governing the distribution of community property on divorce might be inconsistent with New Mexico's system of no-fault divorce." Wife also argues that Husband's reliance on *Delph* is misplaced because it is factually distinct from the present case. Specifically, she argues that the co-insured spouse's deliberate act of destruction in *Delph* is different from her warning Allstate as to Husband's dishonesty.

**{28}** In response, Husband contends the settlement funds are his separate property under Section 40-3-8(A) but that, even if the funds are community property, community property is subject to equitable division. He also argues that the no-fault divorce concept is unrelated to community property division. Husband argues that the cases relied upon by Wife—*Harris*, *Hickson*, and *In re Miller's Estate*—are distinguishable from the present case because they involved life insurance policies whose proceeds were anticipated by the

8

insurance contract, as opposed to car insurance. He also argues that *Dydek* is inapplicable because this Court did not decide whether the bad faith claim in that case was separate or community property, and because, in this case, Wife actively participated with Allstate to defeat Husband's claim. According to Husband, Wife received her community interest in the insurance policy (i.e., one-half the value of the vehicle), but the settlement proceeds were separate property because the settlement was finalized after the entry of the divorce decree.

{29}    As to his "equitable division" point, Husband argues that should we determine that the Allstate proceeds are community property, equity must be taken into account, and we must determine that, based on equitable considerations, Wife is not entitled to any part of the beneficial resolution of the insurance claim. He relies on *Delph* and the equitable underpinnings of *Delph* to support his assertion that to permit Wife to benefit from her wrongdoing and receive a share of the settlement funds in any form of an award in the divorce action would be contrary to and thwarts New Mexico public policy. He also responds to Wife's no-fault divorce argument by arguing that no-fault divorce is unrelated to post-petition spousal behavior. According to Husband, Wife conflated the "fault" of the parties in the dissolution of the marriage and the equitable fault the district court assigned to Wife for her post-petition role in defeating Husband's insurance claim. Husband acknowledges that pre-divorce-petition behavior does not impact the division of community property, but argues that Wife's post-petition behavior should be considered in the equitable balance for spousal support.

## B.    Analysis

{30}    We agree with Wife that the law regarding community property supports her assertion that the settlement proceeds are community property. In determining whether Wife is entitled to a portion of the settlement proceeds as community property, it is useful to begin by establishing that the settlement proceeds are presumptively community property and that the statutes do not support Husband's argument that the proceeds are separate property.

{31}    "Community property" is defined as "property acquired by either or both spouses during marriage which is not separate property." Section 40-3-8(B). "Separate property" is defined, in relevant part, as "property acquired by either spouse before marriage or after entry of a decree of dissolution of marriage[.]" Section 40-3-8(A)(1). In New Mexico, "[p]roperty acquired during marriage by either husband or wife, or both, is presumed to be community property." NMSA 1978, § 40-3-12(A) (1973). "The party asserting that property acquired during marriage is separate bears the burden of presenting evidence that would rebut the presumption by a preponderance of the evidence." *Hodges v. Hodges*, 1984-NMSC-031, ¶ 6, 101 N.M. 67, 678 P.2d 695.

{32}    Husband argues that, regardless of Wife's involvement in the bad faith claim, the settlement proceeds are separate property because he actually received the proceeds approximately four months after the divorce decree was entered, and thus the property was separate under Section 40-3-8(A)(1). However, Husband's characterization of the settlement

9

proceeds as separate property under the statute is inaccurate under New Mexico law. As highlighted by Wife, insurance proceeds that are paid as a result of a policy that is community property, where that policy was paid for with community funds, are community property. *See Russell v. Russell*, 1990-NMCA-080, ¶¶ 3, 12, 111 N.M. 23, 801 P.2d 93 (holding that, in the context of the wife's personal injury claim and recovery for medical expenses, "the community has an interest in the proceeds of the policy as well as in any recovery from the tortfeasor"); *see also Harris*, 1972-NMSC-005, ¶¶ 6, 9 (holding that "[a]n insurance policy and rights incident thereto (including a right to the proceeds) is property" and noting the parties' agreement that "since the insurance policies were acquired with community funds, they therefore became community property"); *Hickson*, 1967-NMSC-083, ¶¶ 3, 10, 22 (holding that the divorced wife "owned the right to receive the proceeds of [a policy insuring the life of the parties' minor child] as community property" even though the minor child died after the parties were divorced, the husband was named as the first beneficiary in the policy, and the husband paid the premiums from the policy from his separate funds after the divorce); *In re Miller's Estate*, 1940-NMSC-021, ¶ 30 ("The policy of insurance, being acquired subsequent to marriage was unquestionably community property. It was kept alive by the payment of the premiums with community funds, and the proceeds resulting from such contract . . . remain as community property to be distributed as such.").

**{33}**    Allstate's alleged bad-faith-claim handling occurred while the parties were married and impacted both parties, who undisputedly had a community interest in the truck. Thus, the settlement proceeds are presumptively community property. With the understanding that the settlement proceeds are presumptively community property, we turn our focus to Husband's position that, regardless of our interpretation of the property as community or separate property under the statutes, the settlement proceeds are nevertheless separate under *Delph*. Husband argues that, per *Delph*, Wife is not entitled to any portion of the settlement proceeds because she did not act to benefit the community when she told Allstate that Husband was dishonest. We hold that *Delph* is distinguishable from the present case and does not form a basis for overcoming New Mexico's presumption in favor of community property. And we hold that the district court erred in denying Wife's community property interest in the settlement proceeds.

**{34}**    As indicated earlier in this opinion, in *Delph*, the husband intentionally set fire to the property, prior to entry of the divorce decree. 1980-NMSC-140, ¶ 3. The specific issue presented on appeal was "whether the intentional burning of a community residence by one spouse will bar recovery by an innocent spouse under a fire insurance policy issued to the community." *Id.* ¶ 6. The Court held that it was clear that both the residence and the insurance policy were community property. *Id.* ¶ 9. However, the law in New Mexico also clearly states that "a spouse who commits a separate tort is individually liable for damages arising out of the tort and that the separate (or segregable) assets of the innocent spouse may not be reached to satisfy the liability arising out of the tort." *Id.* ¶ 13. Because the husband's arson could not be construed to be a benefit to the community, the responsibility for the fraud was separate rather than community and could not be used to void the entire insurance

policy. *Id.* ¶ 14.

**{35}** The holding in *Delph* cannot be used to deny Wife's community interest in the settlement proceeds because the circumstances here are entirely different from the circumstances in *Delph*. In *Delph*, the Court considered the impact of an intentional tort on an innocent spouse. In this case, there was no ruling that Wife committed an intentional tort, or for that matter, any tort. Although the district court opined in a hearing that Wife's actions "may be tantamount to" the tort of interference with contractual relations, there was never an argument or ruling that Wife actually tortiously interfered with Husband's contract. In fact, Husband failed to present evidence or elicit necessary findings that would support a tortious interference with contract claim, which would require proof in relevant part that "[t]here . . . be some voluntary conduct on the part of [Wife]," *Bynum v. Bynum*, 1975-NMCA-005, ¶ 7, 87 N.M. 195, 531 P.2d 618 (internal quotation marks and citation omitted), and that "the contract interference [was] without justification or privilege[.]" *M & M Rental Tools, Inc. v. Milchem, Inc.*, 1980-NMCA-072, ¶ 17, 94 N.M. 449, 612 P.2d 241 (internal quotation marks and citation omitted); *see also Lenscrafters, Inc. v. Kehoe*, 2012-NMSC-020, ¶ 40, 282 P.3d 758 (stating that a plaintiff seeking to prove tortious interference with contract must prove that "the defendant induced the breach without justification or privilege to do so"). There is also no finding by the district court that Wife acted "either with an improper motive or by use of improper means[,]" as required for a tortious interference with contract claim. *Ettenson v. Burke*, 2001-NMCA-003, ¶ 14, 130 N.M. 67, 17 P.3d 440. To the contrary, the evidence presented indicated that, in expressing her opinion as to Husband's dishonesty, Wife was responding to questions posed by Allstate about Husband's credibility and reputation for honesty and truthfulness. Allstate also sent a copy of Husband's inventory to Wife, and she was specifically told to let Allstate know what she thought about the inventory. She was correct to answer those questions as a co-insured and was required to give her honest and accurate answers as an individual who was duly sworn under oath. *See* NMSA 1978, § 30-25-1 (2009) (identifying "perjury" as a fourth degree felony and consisting of "making a false statement under oath"); 14 Steven Plitt et al., *Couch on Insurance* § 199:3 (3d ed. 2016) ("Most insurance policies, whether they are liability or indemnity policies, include what is commonly referred to as a 'cooperation clause.' In instances where a policy does not include such a clause, one has been implied in law." (footnotes omitted)).

**{36}** Additionally, despite Husband's assertions that Wife's accusations were false, there was no evidence or finding by the district court that her responses to Allstate's questions were dishonest or inaccurate. There is no evidence in the record that Wife volunteered information that was harmful to Husband before she was asked to give information, as a co-insured. There is no evidence from which the district court could reasonably infer, find, or conclude that Wife did anything more than cooperate, as she was required to do, or that she gave information beyond the information required in response to Allstate's questions in connection with its investigation of possible fraud.

**{37}** Although Husband argued to the district court that Wife "actively conspired with

11

Allstate[,]" that her conduct was aimed at getting Husband's claim denied, and that she had a bad motive, the district court issued no findings as to Wife's motive. There was nothing in the record, aside from Allstate's speculation, to affirmatively establish that Wife conspiratorially, with an improper motive, acted with an intent to deny a benefit to the community. The district court did find that "but for" Wife's actions, Allstate would have had a different take on how to address the claim and that the bad faith claim arose because of Wife's input; however, those findings do not, on their own, prove intentional, tortious conduct. Because there was no evidence or findings that would indicate that Wife's conduct was intentional and tortious, unlike in *Delph*, *Delph* is not analogous, does not apply, and cannot be relied upon to deny Wife her community interest in the settlement proceeds.

**{38}** Husband essentially is asking this Court to look at *Delph* so broadly that any time a spouse fails to act for the benefit of the community, that spouse's interest in the community property is at risk. But vague notions of wrongful conduct by a spouse cannot be the test for determining whether a spouse's interest in community property should be voided. *Delph* applies in instances in which a spouse is proved to have intentionally and tortiously caused damage to community property. We do not approve of an expansion of *Delph* which would allow a party to generally allege that a spouse behaved badly, absent proof of an intentional tort, and then use those allegations to effectively void the spouse's interest in community property. To affirm and approve of such a broad use of *Delph* would almost certainly, in the oft-quoted words of former New Mexico Governor Bruce King, "open up a whole box of Pandoras."

**{39}** Because neither the statutes nor *Delph* provides a basis under which to deny Wife's community interest in the settlement proceeds, Husband has failed to overcome the presumption in favor of community property. *Hodges*, 1984-NMSC-031, ¶ 6 ("The party asserting that property acquired during marriage is separate bears the burden of presenting evidence that would rebut the presumption by a preponderance of the evidence."). We therefore hold that the district court erred in denying Wife's community share of the settlement proceeds.

## II.      Remaining Matters Within the District Court's Discretion

**{40}** Because we reverse and remand on the ground that the settlement proceeds were improperly determined to be separate property, we choose not to address Husband's arguments on appeal regarding spousal support and the district court's rejection of a time extension. As indicated earlier, because the settlement proceeds are community property and not separate property, the relative assets of the parties are likely to be viewed differently on remand, and the proceeds are likely to be allocated differently. Thus, the spousal support awarded by the district court will likely need to be re-evaluated.

**{41}** Although we do not address Husband's arguments regarding spousal support, for the sake of clarity and guidance on remand, we address Husband's arguments that (1) the district court abused its discretion when it allowed additional, de novo proceedings after Wife failed

12

to offer evidence during the initial merits hearing on spousal support; (2) the district court abused its discretion when it admitted Dr. Amer's testimony and when it relied on that testimony in coming to the conclusion that Wife could not work; and (3) the district court improperly awarded attorney fees. The parties agree that we review these points for abuse of discretion. *See Riggs v. Gardikas*, 1967-NMSC-120, ¶ 8, 78 N.M. 5, 427 P.2d 890 (stating that the district court's decision to not re-open a case and hear additional evidence is reviewed for abuse of discretion); *Roark v. Farmers Grp., Inc.*, 2007-NMCA-074, ¶ 20, 142 N.M. 59, 162 P.3d 896 (recognizing that the admission of evidence is reviewed for abuse of discretion); *Garcia v. Jeantette*, 2004-NMCA-004, ¶ 15, 134 N.M. 776, 82 P.3d 947 ("The decision whether to grant or deny a request for attorney fees rests within the sound discretion of the district court."). An abuse of discretion occurs when "the court's ruling exceeds the bounds of all reason" or "is arbitrary, fanciful, or unreasonable." *Clark v. Clark*, 2014-NMCA-030, ¶ 8, 320 P.3d 991 (internal quotation marks and citation omitted).

## A.    Additional Proceedings

**{42}**    Husband argues that it was error for the district court to permit additional discovery and take new evidence concerning Wife's health condition more than a year after the initial trial on the merits. Husband argues that Wife's pro se status did not entitle her to a second chance at offering evidence and argues that the second trial constituted an abuse of discretion because there had been no change in circumstances relating to Wife's health between the first and second trials. Husband also argues that, after improperly reopening the proceedings, the court arbitrarily refused to consider the whole record to determine spousal support. Husband highlights statements by the judge who initially presided over the case regarding Wife's "signs of malingering to influence [the] court and to avoid being present at hearings scheduled by [the] court and for which she had proper notice." Husband argues that the district court did not consider "all relevant factors" relating to the reopening of the evidence as outlined in *Sena v. New Mexico State Police*, 1995-NMCA-003, ¶ 12, 119 N.M. 471, 892 P.2d 604, including the reasons for Wife's failure to present or obtain the evidence at trial, the prejudice to Husband, the delay in the proceedings, the importance of the evidence to Wife, and whether reasons existed to deny the request for more discovery and evidence. He argues that the court abused its discretion when it refused to listen to and incorporate the previous record when Wife was pro se.

**{43}**    While it is true that pro se parties are held to the same standards as represented litigants, we conclude there was no abuse of discretion in this case. *See Woodhull v. Meinel*, 2009-NMCA-015, ¶ 30, 145 N.M. 533, 202 P.3d 126 (holding that pro se litigants "will not be treated differently than litigants with counsel"). Here, the district court neither re-opened a case per *Sena*, 1995-NMCA-003, ¶ 12, modified an existing award per Section 40-4-7(B)(2)(a), nor provided a new trial as contemplated under Rule 1-059 NMRA. Here, the original judge chose not to rule on spousal support and instead took the matter under advisement. Thus, because spousal support had not been awarded, the newly assigned judge could revisit the issue. Husband glosses over the fact that the district court had continuing jurisdiction over support issues, and the court specifically declined to issue a ruling on

13

support until evidence was presented from Wife's treating doctors regarding her physical condition and ability to earn income.

**{44}** Similarly, the district court did not abuse its discretion when it decided to take new evidence and not listen to the trial that occurred in 2011. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Layne*, 2008-NMCA-103, ¶ 6, 144 N.M. 574, 189 P.3d 707 (internal quotation marks and citation omitted). In this case, the judge, to whom the case was reassigned, appears to have questioned his ability to determine the veracity of the witnesses based on a recording and informed the parties that he would review the evidence from the beginning. Both parties were given the opportunity to present evidence. Husband fails to show how the court's decision is clearly untenable or not justified by reason, and we hold that the court did not abuse its discretion.

**B.     Medical Testimony**

**{45}** Husband next argues that the testimony offered by Wife's treating physician about her condition and level of disability was admitted without foundation and did not support a finding that her medical condition caused her inability to earn income. He argues that "[e]xpert testimony founded upon mere surmise, guess[,] or conjecture is not substantial to support a finding of fact." *Fitzgerald v. Fitzgerald*, 1962-NMSC-028, ¶ 2, 70 N.M. 11, 369 P.2d 398. He then argues that, in general, "to have adequate foundation, a medical expert must testify to a reasonable medical probability regarding causation." In support of his position, Husband looks to case law regarding the "reasonable degree of medical probability" standard in negligence and workers' compensation cases that require plaintiffs to establish a causal connection between the defendant's act or omission and the medical harm. *See, e.g.*, *Alberts v. Schultz*, 1999-NMSC-015, ¶ 29, 126 N.M. 807, 975 P.2d 1279; *Baer v. Regents of the Univ. of Cal.*, 1999-NMCA-005, ¶¶ 21-22, 126 N.M. 508, 972 P.2d 9; *Medina v. Original Hamburger Stand*, 1986-NMCA-107, ¶¶ 1-3, 105 N.M. 78, 728 P.2d 488. Husband generally acknowledges that lay testimony is acceptable to establish the medical condition of a spouse in support proceedings, *see Russell v. Russell*, 1984-NMSC-010, ¶¶ 7, 10, 101 N.M. 648, 687 P.2d 83, but argues that this Court should apply a reasonable medical probability standard to a medical professional's testimony when that professional is offered to establish a causal link between a medical diagnosis or condition and an inability to work. Importantly, Husband is not disputing the existence of Wife's medical conditions or the ability of her treating physician, Dr. Amer, to testify about those conditions. Rather, Husband focuses on the fact that Dr. Amer did not say Wife's medical conditions caused her to be unable to work with a "reasonable [degree of] medical probability."

**{46}** Husband's arguments are unconvincing. Two of Husband's cited cases focus on what medical experts must opine in order to establish causation in negligence cases. *Alberts*, 1999-NMSC-015, ¶ 29 ("If testimony is introduced to establish proximate cause, the

14

evidence thus introduced must show to a reasonable degree of medical probability that the defendant's negligence caused the loss of the chance of a better result."); *Baer*, 1999-NMCA-005, ¶¶ 21-22 (addressing the standard in proving proximate cause in a medical negligence case). The third case cited by Husband interprets a provision of the Workers' Compensation Act that specifically requires that "where the defendants deny that an alleged disability is a natural and direct result of the accident, the workman must establish that causal connection as a *medical probability by expert medical testimony*." *Medina*, 1986-NMCA-107, ¶¶ 1-3 (internal quotation marks and citation omitted).

**{47}**     In this case, neither liability based on medical negligence nor benefits under the Workers' Compensation Act is at issue. Here, Dr. Amer did not opine as to whether an injury was caused by a particular act of negligence or an accident that occurred during employment. Dr. Amer's testimony about Wife's functional limitations for the purposes of a spousal support calculation is notably different from a medical expert giving an opinion about what caused a patient's medical decline. We decline to extend Husband's proposed negligence standard to instances where the testifying provider is not opining as to the cause of a party's injury, but rather is simply describing limitations associated with a particular patient's illness and treatment. The district court did not abuse its discretion when it did not apply the reasonable medical probability standard as requested by Husband.

**{48}**     Furthermore, although Husband argues on appeal that Dr. Amer was testifying as an expert witness under Rule 11-702 NMRA, the nature of the testimony highlighted by Husband suggests that in this particular case, and as to his particular statements about Wife's disability, Dr. Amer was testifying as a lay witness under Rule 11-701 NMRA. To lay a foundation for the admission of Rule 11-701 testimony, the witness must be shown to have "first-hand information" that is "rationally connected to the opinion formed." *Sanchez v. Wiley*, 1997-NMCA-105, ¶ 17, 124 N.M. 47, 946 P.2d 650. Here, Wife's counsel elicited testimony from Dr. Amer that he was Wife's treating physician and was familiar with her medical condition, history, and treatment, such that he had first-hand knowledge of those issues. Dr. Amer was not tendered as an expert witness, and the district court only allowed him to testify as to conditions for which he was treating Wife, despite Wife's attempts to elicit broader testimony. We hold that Dr. Amer's testimony was appropriate under Rule 11-701 and that the "reasonable medical probability" standard that applies to medical experts in medical negligence and workers' compensation cases does not apply.

**{49}**     *Russell*, which considered non-expert testimony about a spouse's medical situation during support proceedings, is instructive. In *Russell*, the district court accepted the wife's testimony as to her state of health, which included a "recent history of serious medical problems including toxic shock syndrome, respiratory failure and cardiac arrest." 1984-NMSC-010, ¶ 6. Our Supreme Court determined that allowing the wife's testimony was not an abuse of discretion because the testimony constituted appropriate non-expert testimony, and the district court had "ample opportunity to observe and question the witness and make a determination as to her credibility and knowledge." *Id.* ¶¶ 7-10. Here, as in *Russell*, the testimony offered by Wife and Dr. Amer regarding Wife's medical conditions and disability

was based on their perception and was helpful in determining a fact at issue. *See* Rule 11-701 (A), (B). While Dr. Amer did testify that he felt Wife was 100 percent disabled and could not reliably hold down a job, that opinion was based on his knowledge about Wife's functional physical limitations.

## C. Attorney Fees

**{50}** "The decision whether to grant or deny a request for attorney fees rests within the sound discretion of the district court." *Garcia*, 2004-NMCA-004, ¶ 15. "Thus we review the district court's ruling on attorney fees only for an abuse of discretion." *Id.* To award fees in a domestic relations proceeding, the court must consider relevant factors presented by the parties, including: (1) "disparity of the parties' resources, including assets and incomes"; (2) "prior settlement offers"; (3) "the total amount of fees and costs expended by each party, the amount paid from community property funds, any balances due and any interim advance of funds ordered by the court"; and (4) "success on the merits." Rule 1-127 NMRA. "In determining whether to award attorney fees, a showing of economic disparity, the need of one party, and the ability of the other to pay, has been characterized as the primary test in New Mexico." *Quintana v. Eddins*, 2002-NMCA-008, ¶ 33, 131 N.M. 435, 38 P.3d 203 (internal quotation marks and citation omitted); *see also Alverson v. Harris*, 1997-NMCA-024, ¶ 26, 123 N.M. 153, 935 P.2d 1165 ("The most important factor the trial court considers in deciding whether to award attorney fees is economic disparity between the parties." (internal quotation marks and citation omitted)).

**{51}** Husband argues that the district court abused its discretion in awarding attorney fees to Wife because the court did not consider the factors outlined in Rule 1-127. Here, there is no doubt that there was a substantial economic disparity. Wife had minimal assets and income. Although she initially attempted to proceed pro se, she ultimately incurred over $41,000 in attorney fees. Husband had more income and had even more income when considering the settlement proceeds. However, given our holding that the settlement proceeds are community property, the disparity between the parties' resources will likely change, and thus the parties' ability to pay may have changed. We therefore remand the issue of attorney fees for further consideration. *See Klinksiek v. Klinksiek*, 2005-NMCA-008, ¶ 29, 136 N.M. 693, 104 P.3d 559 ("We have partially affirmed and partially reversed the district court order. Under these circumstances, while we affirm the award of attorney fees, we hold that it is appropriate for the district court to reconsider the amount of the attorney fees.").

## CONCLUSION

**{52}** The district court's ruling regarding the insurance settlement proceeds is reversed, and the matter is remanded for further proceedings in accordance with this opinion.

**{53}** **IT IS SO ORDERED.**

_____

                                    **JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Chief Judge**


_____

**LINDA M. VANZI, Judge**